STUDIER v MICHIGAN PUBLIC SCHOOL EMPLOYEES'
RETIREMENT BOARD

Docket No. 243796. Submitted January 20, 2004, at Lansing. Decided February 3, 2004, at 9:10 A.M. Leave to appeal sought.

Alberta Studier and six other retirees from public schools brought an action in the Ingham Circuit Court against the Michigan Public School Employees' Retirement Board and others, alleging that the defendants violated US Const, art I, § 10 and Const 1963, art 9, § 24 by increasing the plaintiffs' prescription drug copayments and the deductibles under their health care plan. Also alleged were violations of fiduciary duties. The court Lawrence M. Glazer, J., granted summary disposition in favor of the defendants, refusing to find that health care benefits constitute "accrued financial benefits" under Const 1963, art 9, § 24 and also finding no impairment of contract. The plaintiffs appealed.

The Court of Appeals *held*:

1. Health benefits are not "accrued financial benefits" as that term is used in Const 1963, art 9, § 24. The trial court properly granted summary disposition in this regard.

2. Public school employees have a contractual right under MCL 38.1391(1) to health care benefits. The changes in the deductibles and copayments implemented by the defendants do not operate as a substantial impairment of this contractual relationship. The challenged action does not directly affect the terms of the contract. The alleged impairment does not alter the basic benefit to the retirees and is not substantial.

Affirmed.

1. SCHOOLS — PUBLIC SCHOOL EMPLOYEES' RETIREMENT SYSTEM — HEALTH BENEFITS.

Health benefits provided to a retirant from public school employment or a retirement allowance beneficiary are not "accrued financial benefits" as that term is used in the section of the Michigan Constitution that provides that the accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof that shall not be diminished or impaired thereby (Const 1963, art 9, § 24; MCL 38.1391[1]).

2. CONSTITUTIONAL LAW — COMMERCE CLAUSE.
> The purpose of the constitutional provisions that prohibit the enactment of state laws that impair existing contractual obligations is to protect bargains reached by parties by prohibiting the enactment of laws that interfere with preexisting contractual arrangements; this prohibition, however, must be accommodated to the inherent police power of the state to safeguard the vital interests of its people; a three-pronged test for the valid accommodation of the Commerce Clause and the state's police power determines, first, whether the law has operated as a substantial impairment of a contractual relationship, second, whether the disruption of contract expectancies is necessary to the public good, and, third, whether the means chosen to address the public need are reasonable (US Const, art I, § 10; Const 1963, art 1, § 10).

*White, Schneider, Young & Chiodini, P.C.* (by *Karen Bush Schneider, James A. White,* and *J. Matthew Serra*), for the plaintiffs.

*Michael A. Cox,* Attorney General, *Thomas L. Casey,* Solicitor General, and *Larry F. Brya, Tonatzin M. Alfaro Maiz,* and *Marie Shamraj,* Assistant Attorneys General, for the defendants.

Before: FITZGERALD, P.J., and NEFF and WHITE, JJ.

FITZGERALD, P.J. Plaintiffs appeal as of right an order granting summary disposition pursuant to MCR 2.116(C)(10) in favor of defendants. We affirm.

I

A. FACTS AND PROCEDURAL HISTORY

In October 2000, plaintiffs, who are six public school employee retirees, filed an amended three-count "Complaint for Declaratory Judgment, Injunctive and Other Relief" against the Michigan Public School Employees' Retirement Board (the board), the Michigan Public School Employees' Retirement Sys-

tem (MPSERS), the Michigan Department of Management and Budget (DMB), and the Treasurer of the state of Michigan (collectively referred to as defendants). Count I of the amended complaint alleged that defendants violated Const 1963, art 9, § 24 by increasing plaintiffs' prescription drug copayments and the deductibles under the Master Health Care Plan. Count II of the amended complaint alleged that the board and the DMB violated Const 1963, art 1, § 10 and US Const, art I, § 10 by increasing plaintiffs' prescription drug copayments and the deductibles under the Master Health Care Plan. Count III of the amended complaint alleged that all named defendants violated their trust and fiduciary duties owed to plaintiffs by virtue of implementing a plan to increase prescription drug copayments and the deductible under the Master Health Care Plan.

With respect to plaintiffs' claim that plaintiffs' health care benefits are "accrued financial benefits" as that phrase is defined in Const 1963, art 9, § 24, the trial court held:

> Since both the Michigan Court of Appeals and Michigan Supreme Court have been squarely faced with the opportunity to rule on this question and have declined to do so, this Court cannot rule that health benefits constitute "accrued financial benefits" under Article IX, section 24.

With respect to plaintiffs' claims that defendants' actions impaired a valid contract for health benefits and diminished those benefits, the trial court concluded that

> the MPSERS retirees are still receiving the essentials of their bargain. Their portion of total costs of the plan is essentially unchanged, though the plan's total dollar costs (and

therefore the retirees' total dollar costs) have increased. Their benefits are well within the range of benefits enjoyed by retirees in other State-wide plans of comparable states.

On August 29, 2003, the trial court issued its final opinion and order granting defendants' motion for summary disposition and dismissing plaintiffs' action.

### B. LEGISLATIVE HISTORY OF THE MPSERS HEALTH PLAN

Under the Public School Employees' Retirement Act, MCL 38.201 *et seq.*,[1] the MPSERS first began paying a portion of the premium for health care benefits for its members pursuant to 1974 PA 244:

> On or after January 1, 1995, hospitalization and medical coverage insurance premium payable by any retirant or his beneficiary and his dependents, not to exceed $25.00 per month, under any group health plan authorized by the retirement commission created under this chapter and the department of management and budget shall be paid by the retirement commission from appropriations for this purpose made to the pension accumulation fund created under section 42(1). The payment shall not be made unless the retirant or beneficiary elects coverage under a group plan authorized under this section. [MCL 38.325b(1).]

The amount of the premium paid by the MPSERS gradually increased.[2] The Public School Employees' Retirement Act, 1945 PA 136, was repealed by 1980 PA 300 and replaced with the Public School Employees Retirement Act of 1979, MCL 38.1301 *et seq.* (the act). The amount of the premium paid by the MPSERS pursu-

---

[1] The Public School Employees' Retirement Act, 1945 PA 136, was repealed by 1980 PA 300.

[2] 1978 PA 470 increased the amount to $31 a month. 1979 PA 60 increased the amount to $40 a month.

ant to MCL 38.1391(1) continued to increase.[3] 1983 PA 143 significantly modified the language in subsection 91(1):

> *The retirement system shall pay the entire monthly premium, in the amount authorized by the legislature, for hospital,* medical-surgical, and sick care benefits for the benefit of a retirant or retirement allowance beneficiary who elects coverage in *the* group health insurance or prepaid service plan authorized by the retirement board and the department; *and may pay up to the maximum of that amount toward the monthly premium for hospital, medical-surgical, and sick care benefits for the benefit of a retirant or retirement allowance beneficiary enrolled in another group health insurance or prepaid service plan, if enrolled prior to June 1, 1975 and for whom the retirement system on the effective date of this 1983 amendatory act was making a payment towards his or her monthly premium. A retirant or retirement allowance beneficiary until eligible for medicare shall have an amount equal to the cost chargeable to a medicare recipient for part B of medicare deducted from his or her retirement allowance.* [Emphasis added.][4]

## 1985 PA 91 amended MCL 38.1391(1) again:

> The retirement system shall pay the entire monthly premium *or membership or subscription fee* for hospital, medical-surgical, and sick care benefits for the benefit of a retirant or retirement allowance beneficiary who elects coverage in a group health benefits plan authorized by the retirement board and the department. *The retirement board and the department shall authorize membership in a*

---

[3] 1981 PA 133 increased the amount to $52 a month effective October 7, 1981. 1981 PA 258 increased the amount to $66 a month effective September 30, 1982.

[4] The legislative analysis for HB 4611 stated as the "argument for" the amendment that "[t]he bill would end the necessity of annually amending the PSERS act to reflect the increases in BC/BS rates." House Legislative Analysis, HB 4611, June 16, 1983.

*health maintenance organization licensed under article 17
of the public health code, Act No. 368 of the Public Acts of
1978, being sections 333.20101 to 333.22181 of the Michigan Compiled Laws.* [Emphasis added.]

1989 PA 193 also amended MCL 38.1391(1) to read
as follows:

The retirement system shall pay the entire monthly premium or membership or subscription fee for hospital, medical-surgical, and sick care benefits for the benefit of a retirant or retirement allowance beneficiary who elects coverage in the plan authorized by the retirement board and the department.

Section 91 was amended again by 1996 PA 488 and
1997 PA 143. Section 91 now provides that the MPSERS
shall pay the entire monthly premium of a retiree but
a retiree must pay a portion of the premium if he or
she is a deferred member, does not qualify for Medicare, or has a dependent for which coverage is
provided.

### C. THE MPSERS HEALTH CARE PLAN FROM 1975-1999

The MPSERS provides a health care plan for retirees.
Cost-sharing features have been a part of the health
plan since its inception in 1975. The individual and
family deductible component of the health care plan
has gradually increased from 1982 to 1999, beginning
with a deductible of $50 for each person and $100 for
each family in 1982, and gradually rising to a deductible of $145 for each person and $290 for each family
in 1999. Cost sharing for the prescription drug program also had gradual increases, ranging from a
copay of ten percent in 1975 to a copay of $4 for
generic drugs and $8 for brand name drugs in 1997

through March 31, 2000. There is no dispute that the MPSERS health care plan also gradually increased the benefits available under the plan.

### D. THE CHANGES PERTINENT TO THE PRESENT LAWSUIT

On January 21, 2000, the board amended the MPSERS health care plan. The amendments modified the plan's prescription drug copayment structure and out-of-pocket maximum for prescription drugs effective April 1, 2000, and also implemented a formulary effective January 1, 2001. A formulary is a preferred list of drugs approved by the federal Food and Drug Administration that is designed to give preference to those competing drugs that offer the greatest therapeutic benefit at the most favorable cost. Existing maintenance prescriptions outside the formulary were grandfathered in and subject only to the standard copayment of twenty percent of the drug's cost, with a $4 minimum and a $20 maximum.

The prescription drug copayment was changed to a twenty percent copay, with a $4 minimum and $20 maximum for up to a one-month supply. The copay maximum for mail-order prescription copayment was set at $50 for a three-month supply. A $750 maximum out-of-pocket copay for each calendar year was also established.[5] Under the formulary, eligible persons pay an additional twenty percent of a new nonformulary drug's approved cost only when use of the nonformulary drug is not preapproved by the drug plan administrator.

---

[5] The prior prescription drug component of the MPSERS health care plan did not have an annual out-of-pocket maximum for each person.

The board also adopted a resolution to increase health insurance deductibles from $145 for an individual to $165, and from $290 to $330 for a family, effective January 1, 2000. The deductibles do not apply to prescription drugs. Plaintiffs are challenging the deductible increase of $20 for each individual and $40 for each family.

II

Plaintiffs first argue that the trial court erroneously concluded that health benefits do not constitute "accrued financial benefits" as that phrase is used in Const 1963, art 9, § 24. Constitutional issues and construction are questions of law and are reviewed de novo on appeal. *Mahaffey v Attorney General*, 222 Mich App 325, 334; 564 NW2d 104 (1997); *Wilkins v Gagliardi*, 219 Mich App 260, 266; 556 NW2d 171 (1996).

Const 1963, art 9, § 24 provides:

> The accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby.
>
> Financial benefits arising on account of service rendered in each fiscal year shall be funded during that year and such funding shall not be used for financing unfunded accrued liabilities.

The issue whether health benefits are "accrued financial benefits" for purposes of art 9, § 24 has been addressed by Michigan courts but has not been definitively resolved. *Musselman v Governor*, 448 Mich 503; 533 NW2d 237 (1995) (*Musselman I*), and *Musselman v Governor (On Rehearing)*, 450 Mich 574; 545 NW2d

346 (1996) (*Musselman II*), involved a constitutional challenge to the funding scheme for identified health benefits of § 91 of the act. The challenge came after an executive order was issued that changed the manner in which the health care plan was funded. While the plaintiffs in *Musselman I* and *II* ultimately lost,[6] the issue whether the health care benefits described in § 91 were accrued financial benefits was not definitively resolved. In *Musselman I*, four justices (BOYLE, BRICKLEY, CAVANAGH, and MALLETT) concluded in the Opinion of the Court that health care benefits had to be prefunded under Const 1963, art 9, § 24:

> Whether the restriction to "financial" benefits excludes health care benefits from the scope of the provision depends to some extent on one's point of view. From the perspective of the employee, it is not completely clear that health insurance is a "financial benefit." Although health insurance is not cash that retirants may spend as they wish, employees receive health insurance in lieu of additional compensation, and they would have to purchase insurance if it were not provided to them. This analysis tends to show that retirement health care benefits are financial benefits, but the fact that it does not yield a conclusive answer indicates that this point of view is likely the wrong one.
>
> Instead, the proper perspective from which to interpret the term "financial benefits" seems to be that of the government. The purpose of the provision is, after all, to check legislative bodies, requiring them to fund pension obligations annually, and thereby preventing back door spending. Article 9, § 24 arose out of concern about legislative bodies failing to fund pension obligations at the time they were earned, so that the liabilities of several public pension funds greatly exceeded their assets. At the time of the Con-

---

[6] The Court concluded that mandamus relief was not available because the Supreme Court does not have authority to order the Governor or the Legislature to appropriate funds.

stitutional Convention, the Committee on Finance and Taxation estimated that it would require nearly $600 million to make the two public school employees retirement systems actuarially sound. See 1 Official Record, Constitutional Convention 1961, p 771. Thus, "many pensioners had accumulated years of service for which insufficient money had been set aside in the pension reserve funds to pay the benefits to which their years of service entitled them." *Kosa v State Treasurer*, 408 Mich 356, 365; 292 NW2d 452 (1980).

Failing to fund pension benefits at the time they are earned amounts to borrowing against future budgets, or "back door" spending. Cf. 1 Official Record, Constitutional Convention 1961, pp 772-773. "Back door" spending was the term used by the delegates to refer to the process of establishing pensions without paying the costs at the same time. The delegates intended to prevent this . . . .

For the purpose of securing pension benefits and preventing "back door spending," failing to prefund retirement health care benefits is no different from failing to prefund monthly retirement allowances—a practice that defendants concede is prohibited. In both cases, the cost of the benefit either must be paid as the benefits are earned by the taxpayers who are receiving the direct benefits from the services, or it must be paid as the benefits come due by taxpayers who have received no direct benefit from the services. The constitution requires that benefits be funded as they are earned. Therefore, because the purpose of the provision is to prevent governmental units from amassing bills for pension payments that they do not have money to pay, we hold that the term "financial benefits" must include retirement health care benefits. [*Musselman I, supra* at 511-513.]

Two justices (RILEY and LEVIN) concluded in an opinion concurring in part and dissenting in part that health care benefits could not constitute accrued financial benefits based on the common use of the word "financial," which they opined connoted money and some form of hard currency that can be spent:

The majority's ultimate conclusion, however, misses the mark because when interpreting the language of the constitution, unambiguous terms are given their plain meaning . . . . The normal usage of the word "financial" connotes money and "money" connotes some form of hard currency that can be "spent."

The financial world shares a similar interpretation of this term. In an article appearing in the National Mortgage News on January 14, 1991, a definition of a financial instrument appeared that is directly relevant. In this article, a proposal by the Financial Accounting Standards Board, which creates guidelines for general accounting principles, was discussed. Specifically, the proposal required "financial institutions to report the current value of all 'financial instruments' in their portfolios." "FASB Opts for Current Value Reports," National Mortgage News, January 14, 1991, p 8. Moreover, it is interesting to note that "[t]he FASB proposal *excludes* pension benefits, leases, insurance policies and similar items from its definition of financial instruments." *Id.* at 9 (emphasis added). Hence, if the FASB does not consider pension benefits and insurance policies to fall under the definition of a financial instrument, it is not a large leap to conclude that health insurance benefits included in a pension plan are not financial instruments and hence are not financial benefits.

This conclusion by the FASB, although not controlling, sheds a great deal of light on the proper interpretation of the term "financial benefit." However, even more illuminating is the case of *Port Huron Area School Dist v Port Huron Ed Ass'n*, 120 Mich App 112, 116; 327 NW2d 413 (1982). In that case, the Court of Appeals interpreted the term "financial resource" as including funds, assets, and expected revenues. "We hold that the term 'financial resources' means the funds-assets, expected revenues, etc.—available for expenditure by the [district] in a given year." The reference in this definition to funds, assets, and expected revenues once again demonstrates that the term "financial" is understood to involve actual money. Consequently, it is difficult to find that a health benefit is a financial benefit.

This conclusion finds further support in the fact that even money does not always equal a financial benefit. In *Jurva v Attorney General*, 419 Mich 209, 224; 351 NW2d 813 (1984), this Court found that cash payments as an incentive for early retirement did not constitute financial benefits. "We find, therefore, that early retirement incentives are not 'financial benefits arising on account of service rendered' and that Const 1963, art 9, § 24 is inapplicable."

While the majority does attempt to substantiate its conclusion that health benefits are equal to financial benefits by looking to the intent of the framers of the provision, such an examination is improper because, as stated by Justice Cooley in *Blodgett*, "the light to be derived from an examination of the proceedings of constitutional conventions, on questions of constitutional construction, is commonly vague and inconclusive, and not to be allowed, in any case, to control the meaning of unambiguous terms." *Id.* at 166. . . .

Because the term "financial" has a commonly understood meaning, there is no need to look to the framers' intent behind the provision. Thus, I believe that the majority's analysis regarding the purpose behind the provision is improper.

Furthermore, it is questionable whether the framers even intended that financial benefits equal health benefits. The legislative history indicates that the term originally recommended for this provision by the advisory committee was "benefit," which has a broad connotation.

"The committee recommends that the following be included in the constitution:

"Sec. a. The accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof, which shall not be diminished or impaired thereby.

"All such *benefits* arising on account of service rendered in each fiscal year shall be funded during that year and such funding shall not be usable for financing unfunded accrued liabilities." [1 Official Record, Constitutional Convention 1961, p 770. Emphasis added.]

However, in the final draft, the framers limited the term "benefit" by adding the word "financial."

"*Financial benefits* arising on account of service rendered in each fiscal year shall be funded during that year and such funding shall not be used for financing unfunded accrued liabilities." [Const 1963, art 9, § 24. Emphasis added.]

Hence, the problem with the majority's conclusion is that the framers' creation specifically classifies the type of benefit protected as financial. The framers had every opportunity to use the broader solitary term "benefit" when it was recommended in that form, but chose not to do so. This fact leads to the inevitable conclusion that the framers actually intended to limit the definitional umbrella of "benefit" by narrowing it with the use of the term "financial." In fact, when the vote was taken on April 19, 1962, the proposal that included the term "financial benefit" was overwhelmingly approved with 117 yeas and only 1 nay. 2 Official Record, Constitutional Convention 1961, p 2659. Consequently, even if we look at the legislative history behind the provision, we come to the realization that the framers wanted a narrower meaning for the term "benefit."

\*          \*          \*

. . . The specific word chosen, "financial," identifies the class restricting the meaning of the general word "benefit" to that class, "financial benefits." If the framers had wanted the term "benefit" to be used in a broad sense, they would not have used the term "financial" to limit it. Here the framers had a chance to limit the term to only "benefit," and actually made that recommendation, but, in the end, the limiting term "financial" appeared. Consequently, because a court "should not, without clear and cogent reason to the contrary, give a statute a construction the legislature itself plainly refused to give," *People v Adamowski*, 340 Mich 422, 429; 65 NW2d 753 (1954), it only makes sense that we should not extend to the term "benefit" a broader meaning that the framers clearly rejected. [*Musselman I, supra* at 526-532.]

Justice WEAVER did not participate in the decision in *Musselman I*.

When the case was before the Supreme Court on rehearing in *Musselman II*, three justices[7] opined that the health benefits contained in § 91 were not accrued financial benefits for which there is constitutional protection under art 9, § 24. Justice WEAVER reasoned in a separate opinion:

> The pension and retirement systems in place at the time of the 1961 Constitutional Convention consisted solely of monies paid in the form of a monthly stipend to a retired employee based on years of service. To the electorate, the juxtaposition could not have been more clear: financial benefits of each pension plan and retirement system would be prefunded. However, it would not have been anticipated that these systems included health benefits because health benefits simply did not exist, nor were they expressly included within the scope of accrued financial benefits. [*Musselman II, supra* at 579.]

Justice BRICKLEY, in a separate opinion in *Musselman II*, changed his position from the one he had taken in *Musselman I*, opining that resolution of the case did not require addressing the issue whether health benefits are accrued financial benefits.

We agree with the reasoning of Justices RILEY, LEVIN, and WEAVER, and conclude that health benefits are not "accrued financial benefits" as that term is used in Const 1963, art 9, § 24. Thus, the trial court properly granted summary disposition with regard to count I of plaintiffs' complaint.

---

[7] Justices RILEY, LEVIN, and WEAVER.

III

Plaintiffs contend that the trial court erroneously granted summary disposition of count II of their complaint because there is a genuine issue of material fact with regard to whether the modifications to the health care plan constituted a substantial impairment of contract.

Both the federal and state constitutions prohibit the enactment of state law that impairs existing contractual obligations. US Const, art I, § 10; Const 1963, art 1, § 10. The language contained in our state constitution, virtually identical to that used in the federal constitution, provides: "No bill of attainder, ex post facto law or law impairing the obligation of contract shall be enacted." The purpose of the Contract Clause is to protect bargains reached by parties by prohibiting states from enacting laws that interfere with preexisting contractual arrangements. *Allied Structural Steel Co v Spannaus*, 438 US 234, 242; 98 S Ct 2716; 57 L Ed 2d 727 (1978).

While the Contract Clause prohibits any state law from impairing the obligations of contract, this prohibition must be "accommodated to the inherent police power of the State 'to safeguard the vital interests of its people.'" *Energy Reserves Group, Inc v Kansas Power & Light Co*, 459 US 400, 410; 103 S Ct 697; 74 L Ed 2d 569 (1983), quoting *Home Bldg & Loan Ass'n v Blaisdell*, 290 US 398, 434; 54 S Ct 231; 78 L Ed 413 (1934). The prohibition, therefore, is not absolute. To test for the valid accommodation of the Contract Clause and the state's police power, the United States Supreme Court has established a three-pronged test. The first prong is to determine "whether the state law

has, in fact, operated as a substantial impairment of a contractual relationship." *Allied, supra* at 244. The second prong requires that the legislative disruption of contract expectancies be necessary to the public good, and the third prong requires that the means chosen by the Legislature to address the public need be reasonable. *Id.* at 247; *Romein v Gen Motors Corp,* 436 Mich 515, 535-536; 462 NW2d 555 (1990).

Plaintiffs claim that defendants' actions in increasing the Master Health Care Plan deductibles and prescription drug copayments impair the contract they had by operation of MCL 38.1391(1). Thus, this Court must first address the first prong of the test for impairment of contract and determine what contractual rights, if any, the legislation established. MCL 38.1391(1) provides:

> The retirement system shall pay the entire monthly premium or membership or subscription fee for hospital, medical-surgical, and sick care benefits for the benefit of a retirant or retirement allowance beneficiary who elects coverage in the plan authorized by the retirement board and the department.

A state contractual obligation arises from legislation only if the Legislature has unambiguously expressed an intention to create the obligation. See, e.g., *United States Trust Co of New York v New Jersey,* 431 US 1, 17 n 14; 97 S Ct 1505; 52 L Ed 2d 92 (1977). In order to prove that a statutory provision has formed the basis of a contract, the language employed in the statute must be "plain and susceptible of no other reasonable construction" than that the Legislature intended to be bound by a contract. *Stanislaus Co v San Joaquin & King's River Canal & Irrigation Co,* 192 US 201, 208; 24 S Ct 241; 48 L

Ed 406 (1904). A statute can create a contract if the language and circumstances demonstrate a clear expression of legislative intent to create private rights of a contractual nature enforceable against the state. *United States Trust, supra* at 17 n 14; *Blue Cross & Blue Shield of Michigan v Governor*, 422 Mich 1; 367 NW2d 1 (1985).

In *Musselman I, supra* at 505 n 1, the Supreme Court stated that "the defendants conceded that these statutes [including § 91(1)] create a right to receive health benefits that may not be impaired," and that "defendants[8] concede that retirement health care benefits are contractual benefits subject to Const 1963, art 1, § 10." *Musselman I, supra* at 519 n 19. While these concessions are not binding in this litigation, the language of MCL 38.1391(1) demonstrates a clear expression of legislative intent to create contractual rights for public school employees.[9] Health insurance is part of an employee's benefit package and the whole package is an element of consideration that the state contracts to tender in exchange for services rendered by the employee.

The second inquiry of prong one is whether the changes in the deductibles for the Master Health Care Plan and in the copayments for prescription drugs operate as a "substantial impairment" of a contractual relationship. Deductibles and copayments have historically been a component of the MPSERS health care plan. The challenged action of defendants does not

---

[8] The defendants in *Musselman I* included the board and the Treasurer of the state of Michigan.

[9] Because all the plaintiffs in this case have retired and, therefore, have vested health benefits, a discussion about when health care benefits become vested benefits is not necessary in this case.

directly affect the terms of the contract. The board continues to pay the entire monthly premium for health benefits for retirees as provided in subsection 91(1), and the payment of a particular premium, i.e., the "full cost" of the premium, is what is provided by statute. The alleged impairment does not alter this basic benefit to the retiree and is therefore not substantial.[10]

Affirmed.

---

[10] Further, subsection 91(1) makes the payment of premiums subject to a retirant or retirant allowance beneficiary electing "coverage in the plan authorized by the retirement board and the department." The statute does not provide, however, for a particular health care plan, and, in fact, does not provide for prescription drug coverage. To the contrary, the language of the statute contemplates that the board may change the health care plan. The board has not lessened the coverage available under the health care plan but, rather, has added coverage for new procedures, new services, and new prescription drugs.