TAYLOR, C. J.
We granted leave in this case to consider two issues. The first is whether health care benefits paid to public school retirees constitute “accrued financial benefits” subject to protection from diminishment or impairment by Const 1963, art 9, § 24. We hold that they do not and, accordingly, affirm the Court of Appeals determination on this issue.[1] The second issue is whether the statute establishing the health care benefits, MCL 38.1391(1), created a contract with the public school retirees that could not be changed by a later legislature because to do so would unconstitutionally impair an existing contractual obligation in violation of US Const, art I, § 10 and Const 1963, art 1, § 10. The Court of Appeals determined that MCL 38.1391(1) established a contract, but that the Legislature’s subsequent changes were insubstantial and, thus, there was no constitutionally impermissible impairment of contract. The Court of Appeals erred on this issue because MCL 38.1391(1) did not create a contract. However, because the Court of Appeals reached the correct result, we affirm its determination that the *646 circuit court properly entered summary disposition in defendants’ favor.
I. FACTUAL HISTORY AND PROCEDURAL POSTURE
The Michigan Public School Employees’ Retirement Board (board) began providing a health care plan for public school retirees in 1975 pursuant to amendments made by 1974 PA 244 to the former Public School Employees Retirement Act, 1945 PA 136, which was the predecessor of the current Public School Employees Retirement Act, 1980 PA 300, MCL 38.1301 et seq. Since that time, participants in the plan have been required to pay deductibles and copays for prescription drugs, and the amounts of the deductibles and copays have gradually increased throughout the years because of numerous amendments the board has made to the plan to reflect the rising costs of health care and advances in medical technology. The present case arises from the two most recent amendments made to the plan by the board. The first amendment became effective on January 1, 2000, and increased the amount of the deductibles that retirees are required to pay. The second amendment occurred on January 21, 2000, and increased the copays and out-of-pocket máximums that retirees are required to pay for prescription drugs. The Court of Appeals succinctly summarized those amendments as follows:
The amendments modified the plan’s prescription drug copayment structure and out-of-pocket maximum for prescription drugs effective April 1, 2000, and also implemented a formulary effective January 1, 2001. A formulary is a preferred list of drugs approved by the federal Food and Drug Administration that is designed to give preference to those competing drugs that offer the greatest therapeutic *647 benefit at the most favorable cost. Existing maintenance prescriptions outside the formulary were grandfathered in and subject only to the standard copayment of twenty percent of the drug’s cost, with a $4 minimum and a $20 maximum.
The prescription drug copayment was changed to a twenty percent copay, with a $4 minimum and $20 maximum for up to a one-month supply. The copay maximum for mail-order prescription copayment was set at $50 for a three-month supply. A $750 maximum out-of-pocket copay for each calendar year was also established. [The plan did not previously contain an annual out-of-pocket maximum.] Under the formulary, eligible persons pay an additional twenty percent of a new nonformulary drug’s approved cost only when use of the nonformulary drug is not preapproved by the drug plan administrator.
The board also adopted a resolution to increase health insurance deductibles from $145 for an individual to $165, and from $290 to $330 for a family, effective January 1, 2000. The deductibles do not apply to prescription drugs.[2]
Plaintiffs, six public school retirees, filed suit for declaratory and injunctive relief against the board, the Michigan Public School Employees’ Retirement System (MPSERS), the Michigan Department of Management and Budget, and the Treasurer of the state of Michigan. Although plaintiffs’ complaint contained three counts, only counts I and II remain for our consideration. Count I alleged that the copay and deductible increases violate Const 1963, art 9, § 24, which prohibits the state or a political subdivision from diminishing or impairing the “accrued financial benefits” of any pension plan or retirement system it offers. Count II alleged that the copay and deductible increases violate Const 1963, art 1, § 10 and US Const, art I, § 10, both of which prohibit
*648 the enactment of a law that impairs an existing contractual obligation.
Both sides moved for summary disposition on these counts and the trial court granted defendants’ motion pursuant to MCR 2.116(C)(10). With respect to count I, the trial court rejected plaintiffs’ claim that health care benefits are “accrued financial benefits” under Const 1963, art 9, § 24, holding that the Court of Appeals and this Court “ ‘have been squarely faced with the opportunity to rule on this question and have declined to do so____’ ” 260 Mich App at 462. With respect to count II, the trial court, after noting the similarity between the MPSERS health care plan and those offered by other states, concluded that MCL 38.1391(1) does establish a contract with the plaintiffs but that, because the proportions of the total costs for deductibles and copays borne by the plaintiffs were essentially unchanged, the impairment was too insubstantial to create an impairment the law would recognize.
Plaintiffs appealed to the Court of Appeals, which affirmed the trial court’s ruling entirely. Thus, the panel held that health care benefits are not “accrued financial benefits” subject to protection by Const 1963, art 9, § 24, and that the Legislature’s enactment of MCL 38.1391(1) created a contract, but the impairment was too de minimis to be recognized.
Plaintiffs applied for leave to appeal to this Court, seeking to challenge the Court of Appeals determinations that health care benefits are not “accrued financial benefits” protected by Const 1963, art 9, § 24 and that the deductible and copay increases implemented by the health care plan amendments are not a substantial impairment of plaintiffs’ contractual right to receive health care benefits. Defendants filed an application for *649 leave to appeal, seeking to challenge the Court of Appeals conclusion that MCL 38.1391(1) vests plaintiffs with a contractual right. We granted both applications and ordered that they be submitted together.[3]
II. STANDARD OF REVIEW
This Court reviews de novo a trial court’s decision regarding a motion for summary disposition. Taxpayers of Michigan Against Casinos v Michigan, 471 Mich 306, 317; 685 NW2d 221 (2004). This case also involves constitutional issues, as well as issues of statutory construction. These issues are reviewed de novo by this Court. Wayne Co v Hathcock, 471 Mich 445, 455; 684 NW2d 765 (2004).
III. ANALYSIS OF CONST 1963, ART 9, § 24
Const 1963, art 9, § 24 provides:
The accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby.
Financial benefits arising on account of service rendered in each fiscal year shall be funded during that year and such funding shall not be used for financing unfunded accrued liabilities.
These two clauses unambiguously prohibit the state and its political subdivisions from diminishing or impairing “accrued financial benefits,” and require them to fund “accrued financial benefits” during the fiscal year for which corresponding services are rendered. To apply this, we are called upon to determine what is an *650 “accrued financial benefit” and, in particular, whether health care benefits are such a benefit.
This Court has twice considered the issue whether health care benefits fall within the ambit of “accrued financial benefits” protected by art 9, § 24. In the first instance, Musselman v Governor, 448 Mich 503; 533 NW2d 237 (1995) (Musselman I), six members of this Court[4] considered a constitutional challenge to the state’s failure to fund retirement health care benefits being earned by nonretired public school employees during the 1990-1991 school year. In determining whether the state’s failure to do so violated the “prefunding” requirement of the second clause of art 9, § 24, a four-member majority of this Court determined that health care benefits are, indeed, included within the term “accrued financial benefits.” Focusing primarily on statements by some of the constitutional delegates who supported art 9, § 24 that they were concerned about the future ability of governmental entities to pay retirement benefits if the entities did not set aside funding to do so during each year of a public employee’s service,[5] the majority reasoned that “because the purpose of the provision is to prevent governmental units from amassing bills for pension payments that they do not have money to pay, we hold that the term ‘financial benefits’ must include retirement health care benefits.” Musselman I, supra at 513. Justice RILEY, joined by Justice LEVIN, dissented from this portion of the majority’s analysis primarily on the basis of her conclusion that the term “financial” is commonly understood to *651 connote monetary obligations and, thus, the term “financial benefits” does not encompass health care benefits. Id. at 525-532.
This Court subsequently granted rehearing in Musselman v Governor (On Rehearing), 450 Mich 574; 545 NW2d 346 (1996) (Musselman II), and the prior majority lost a vote because Justice BRICKLEY stated that he no longer believed that interpretation of art 9, § 24 was necessary to resolve the case. Musselman II, supra at 576-577. Justice WEAVER, now participating, joined Justice RlLEY’s dissent on the issue and also wrote separately, saying that the electorate could not have intended the phrase “accrued financial benefits” to include health care benefits because the pension and retirement systems in place at the time art 9, § 24 was adopted consisted only of monthly stipends. Id. at 579-580. Justice WEAVER further concluded that statements by constitutional convention delegates show that they had employed the phrase “accrued financial benefits” for the specific purpose of limiting the contractual right of public school employees under art 9, § 24 to deferred compensation embodied in a pension plan. Musselman II, supra at 580, quoting 1 Official Record, Constitutional Convention 1961, pp 771, 773-774 (delegate Van Dusen). Thus, with six justices splitting three to three on the issue, the question whether health care benefits are included within the phrase “accrued financial benefits” remained unresolved by this Court. However, as did the Court of Appeals in the present case,[6] we agree with Justices RILEY, WEAVER, and LEVIN that they are not.
As Justice RILEY correctly pointed out in her dissent in Musselman I, the majority “misse[d] the mark” by focusing on the history behind art 9, § 24 and the intent *652 of the constitutional convention delegates in proposing it, rather than on the interpretation that the people would have given the provision when they adopted it. Musselman I, supra at 526. Indeed, we recently stated the correct standard to be applied when interpreting constitutional provisions in Hathcock, supra at 468:
The primary objective in interpreting a constitutional provision is to determine the text’s original meaning to the ratifiers, the people, at the time of ratification. [People v Nutt, 469 Mich 565, 573; 677 NW2d 1 (2004).] This rule of “common understanding” has been described by Justice COOLEY in this way:
“A constitution is made for the people and by the people. The interpretation that should be given it is that which reasonable minds, the great mass of the people themselves, would give it. ‘For as the Constitution does not derive its force from the convention which framed, but from the people who ratified it, the intent to be arrived at is that of the people, and it is not to be supposed that they have looked for any dark or abstruse meaning in the words employed, but rather that they have accepted them in the sense most obvious to the common understanding, and ratified the instrument in the belief that that was the sense designed to be conveyed.’ ” [Traverse City School Dist v Attorney General, 384 Mich 390, 405; 185 NW2d 9 (1971) (emphasis in original), quoting'l Cooley, Constitutional Limitations (6th ed), p 81.]
In short, the primary objective of constitutional interpretation is to realize the intent of the people by whom and for whom the constitution was ratified.
In order to reach the objective of discerning the intent of the people when ratifying a constitutional provision, we apply the plain meaning of each term used therein at the time of ratification unless technical, legal terms were employed. Phillips v Mirac, Inc, 470 Mich 415, 422; 685 NW2d 174 (2004). In this case, the term *653 “benefits” is modified by the words “financial” and “accrued.” Because these adjectives are not technical, legal terms that would have been ascribed a particular meaning by those learned in the law at the time the Constitution was ratified,[7] we discern the intent of the people in ratifying art 9, § 24 by according the adjectives their plain and ordinary meanings at the time of ratification.[8]
We first note that, despite specifically stating that the threshold issue in determining whether health care benefits were subject to the prefunding requirement of the second clause of art 9, § 24 is whether they constitute “accrued financial benefits” within the meaning of the first clause of art 9, § 24,[9] the majority in Mussel-man I did not address the term “accrued.” At the time that our 1963 Constitution was ratified, the term “accrue” was commonly defined as “to increase, grow,” “to come into existence as an enforceable claim; vest as a right,” “to come by way of increase or addition: arise as a growth or result,” “to be periodically accumulated in the process of time whether as an increase or a decrease,” “gather, collect, accumulate,” Webster’s Third New Int’l Dictionary (1961), p 13, or “to happen or result as a natural growth; arise in due course; come or fall as an addition or increment,” “to become a present and enforceable right or demand,” Random House *654 American College Dictionary (1964), p 9. Thus, according to these definitions, the ratifiers of our Constitution would have commonly understood “accrued” benefits to be benefits of the type that increase or grow over time — such as a pension payment or retirement allowance that increases in amount along with the number of years of service a public school employee has completed.[10] Health care benefits, however, are not benefits of this sort. Simply stated, they are not accrued. Under MCL 38.1391(1),[11] which the plaintiffs in this case rely on, neither the amount of health care benefits a public school employee receives nor the amount of the premium, subscription, or membership fee that MPSERS pays increases in relation to the number of years of service the retiree has performed.
That art 9, § 24 only protects those financial benefits that increase or grow over time is not only supported but, indeed, confirmed by the interaction between the first and second clauses of that provision. Specifically, the first clause contractually binds the state and its political subdivisions to pay for retired public employees’ “accrued financial benefits . . ..” Thereafter, the second clause seeks to ensure that the state and its political subdivisions will be able to fulfill this contractual obligation by requiring them to set aside funding each year for those “ [financial benefits arising on account of service rendered in each fiscal year. . . .” Thus, because the second clause only requires the state and its political subdivision to set aside funding for “[f]inancial benefits arising on account of service ren *655 dered in each fiscal year” to fulfill their contractual obligation of paying for “accrued financial benefits,” it reasonably follows that “accrued” financial benefits consist only of those “[financial benefits arising on account of service rendered in each fiscal year ... .”[12]
Moreover, health care benefits do not qualify as “financial” benefits. At the time Const 1963, art 9, § 24 was ratified, the term “financial” was commonly defined as “pertaining to monetary receipts and expenditures; pertaining or relating to money matters; pecuniary,” Random House, supra, p 453, or “relating to finance or financiers,” Webster’s, supra, p 851, and “finance” was commonly defined as “pecuniary resources, as of. . . an individual; revenues,” Random House, supra-, accord Webster’s, supra. “Pecuniary,” in turn, was commonly defined as “consisting of or given or extracted in money,” or “of or pertaining to money.” Random House, supra, p 892; accord Webster’s, supra, p 1663. Accordingly, the ratifiers of our Constitution would have commonly understood “financial” benefits to include only those benefits that consist of monetary payments, and not benefits of a nonmonetary nature such as health care benefits.
We further point out that, even if the phrase “accrued financial benefits” were ambiguous and, thus, it would be permissible or necessary to consult the statements of delegates during the constitutional convention debates, the majority’s approach in doing so in Mussel-man I was fundamentally flawed. Specifically, although *656 this Court has continually recognized that constitutional convention debates are relevant to determining the meaning of a particular provision, Lapeer Co Clerk v Lapeer Circuit Court, 469 Mich 146, 156; 665 NW2d 452 (2003); People v Nash, 418 Mich 196, 209; 341 NW2d 439 (1983) (opinion by BRICKLEY, J.), we take this opportunity to clarify that, when necessary, the proper objective in consulting constitutional convention debates is not to discern the intent of the framers in proposing or supporting a specific provision, but to determine the intent of the ratifiers in adopting the provision, Nutt, supra at 574.[13] We highlighted this distinction in Univ of Michigan Regents v Michigan, 395 Mich 52, 59-60; 235 NW2d 1 (1975), in which we stated:
The debates must be placed in perspective. They are individual expressions of concepts as the speakers perceive them (or make an effort to explain them). Although they are sometimes illuminating, affording a sense of direction, they are not decisive as to the intent of the general convention (or of the people) in adopting the measures.
Therefore, we will turn to the committee debates only in the absence of guidance in the constitutional language ... or when we find in the debates a recurring thread of explanation binding together the whole of a constitutional concept.
Bearing this principle in mind, the primary focus of the majority in Musselman I should not have been on the intentions of the delegates in supporting art 9, § 24 but, rather, on any statements they may have made that would have shed light on why they chose to employ the particular terms they used in drafting the provision to *657 aid in discerning what the common understanding of those terms would have been when the provision was ratified by the people.[14] In this regard, it is important to note that the majority in Musselman I did, in fact, locate such evidence but chose to disregard it, stating:
The only explicit elaboration on the term “accrued financial benefits” was this remark by delegate Van Dusen:
“[T]he words ‘accrued financial benefits’ were used designedly, so that the contractual right of the employee would be limited to the deferred compensation embodied in any pension plan, and that we hope to avoid thereby a proliferation of litigation by individual participants in retirement systems talking about the general benefits structure, or something other than his specific right to receive benefits.”
Unfortunately, he addresses which rights are contractual, and thus enforceable at law under the first clause of Const 1963, art 9, § 24 — a question distinct from what must be prefunded under the second clause. [Musselman I, supra at 510 n 8, quoting 1 Official Record, Constitutional Convention 1961, pp 773-774.]
This statement by delegate Van Dusen is directly relevant to discerning the common understanding of the words “accrued” and “financial” at the time of the constitutional convention and, indeed, reinforces our conclusion that the ratifiers would have commonly *658 understood the phrase “accrued financial benefits” to be one of limitation that would restrict the scope of protection provided by art 9, § 24 to monetary payments for past services. The Musselman I majority’s stated reason for disregarding this statement, that delegate Van Dusen was stating why that phrase was used in the first clause of art 9, § 24', and not why it was used in the second clause, is illogical. Stated simply, there is no reason to believe that the ratifiers would have interpreted the phrase “accrued financial benefits” any differently when reading the second clause than they would have when reading the first. Indeed, it would be unreasonable to assume, in the circumstance where they were drafted together and presented to the ratifiers at the same time, that there was any other intent. In discussing this concept, Justice COOLEY stated, “[a]s a general thing, it is to be supposed that the same word is used in the same sense wherever it occurs in a constitution.” 1 Cooley, Constitutional Limitations (8th ed), p 135.[15]
Thus, in summary, we hold that health care benefits are not protected by Const 1963, art 9, § 24 because they neither qualify as “accrued” benefits nor “finan *659 cial” benefits as those terms were commonly understood at the time of the Constitution’s ratification and, thus, are not “accrued financial benefits.”
IV ANALYSIS OF CONST 1963, ART 1, § 10 AND US CONST, ART I, § 10
The plaintiffs here assert that, by enacting MCL 38.1391(1), the Legislature created a contractual right by public school retirees to receive health care benefits and, further, that this contractual right could not be altered or abolished by successive legislatures without violating Const 1963, art 1, § 10[16] and US Const, art I, § 10,[17] both of which prohibit the state from enacting any law that impairs existing contractual obligations. We disagree.
MCL 38.1391(1) provides:
The retirement system[18] shall pay the entire monthly premium or membership or subscription fee for hospital, medical-surgical, and sick care benefits for the benefit of a retirant or retirement allowance beneficiary who elects coverage in the plan authorized by the retirement board and the department![19]
The Court of Appeals determined that this statute does create for plaintiffs a contractual right to receive health care benefits, but that the copay and deductible increases implemented by the board do not amount to a substantial impairment of that contractual right. How *660 ever, we conclude that MCL 38.1391(1) does not create for retirees a contractual right to receive health care benefits and, therefore, reverse the Court of Appeals determination on that point.
Of primary importance to the viability of our republican system of government is the ability of elected representatives to act on behalf of the people through the exercise of their power to enact, amend, or repeal legislation. Therefore, a fundamental principle of the jurisprudence of both the United States and this state is that one legislature cannot bind the power of a successive legislature.[20] We recently reiterated this principle at length in LeRoux v Secretary of State, 465 Mich 594, 615-616; 640 NW2d 849 (2002), quoting Atlas v Wayne Co Bd of Auditors, 281 Mich 596, 599; 275 NW 507 (1937):
“The act of one legislative body does not tie the hands of future legislatures. Cooper, Wells & Co v City of St Joseph, 232 Mich 255 [205 NW 86 (1925)]. The power to amend and repeal legislation as well as to enact it is vested in the legislature, and the legislature cannot restrict or limit its right to exercise the power of legislation by prescribing modes of procedure for the repeal or amendment of statutes; nor may one legislature restrict or limit the power of its successors .... [Additionally,] [o]ne legislature cannot enact irrepealable legislation or limit or restrict its own power, or the power of its successors, as to the repeal of statutes; and an act of one legislature is not binding on, and does not tie the hands of, future legislatures.”
Although this venerable principle that a legislative body may not bind its successors can be limited in some *661 circumstances because of its tension with the constitutional prohibitions against the impairment of contracts, thus enabling one legislature to contractually bind another, Winstar.; supra at 872-874, such surrenders of legislative power are subject to strict limitations that have developed in order to protect the sovereign prerogatives of state governments, id. at 874-875. A necessary corollary of these limitations that has been developed by the United States Supreme Court, and followed by this Court, is the strong presumption that statutes do not create contractual rights. Nat’l R Passenger Corp v Atchison, Topeka & Santa Fe R Co, 470 US 451, 465-466; 105 S Ct 1441; 84 L Ed 2d 432 (1985); In re Certified Question (Fun ‘N Sun RV, Inc v Michigan), 447 Mich 765, 777-778; 527 NW2d 468 (1994). This presumption, and its relation to the protection of the sovereign powers of a legislature, was succinctly described by the United States Supreme Court in Nat’l R, supra at 465-466:
For many decades, this Court has maintained that absent some clear indication that the legislature intends to bind itself contractually, the presumption is that “a law is not intended to create private contractual or vested rights but merely declares a policy to be pursued until the legislature shall ordain otherwise.” Dodge v. Board of Education, 302 U.S. 74, 79 [58 S Ct 98; 82 L Ed 57] (1937). See also Rector of Christ Church v. County of Philadelphia, 24 How. 300, 302 [65 US 300; 16 L Ed 602] (1861) (“Such an interpretation is not to be favored”). This well-established presumption is grounded in the elementary proposition that the principal function of a legislature is not to make contracts, but to make laws that establish the policy of the state. Indiana ex rel. Anderson v. Brand, 303 U.S. 95, 104-105 [58 S Ct 443; 82 L Ed 685] (1938). Policies, unlike contracts, are inherently subject to revision and repeal, and to construe laws as contracts when the obligation is not clearly and unequivocally expressed would be to limit drastically the essential powers of a legislative body. *662 Indeed, “ ‘[t]he continued existence of a government would be of no great value, if by implications and presumptions, it was disarmed of the powers necessary to accomplish the ends of its creation.’ ” Keefe v. Clark, 322 U.S. 393, 397 [64 S Ct 1072; 88 L Ed 1346] (1944) (quoting Charles River Bridge v. Warren Bridge, 11 Pet. 420, 548 [36 US 420; 9 L Ed 773] (1837)). Thus, the party asserting the creation of a contract must overcome this well-founded presumption, Dodge, supra, at 79, and we proceed cautiously both in identifying a contract within the language of a regulatory statute and in defining the contours of any contractual obligation.
The first step in this cautious procession is to examine the statutory language itself. Nat’l R, supra at 466. In order for a statute to form the basis of a contract, the statutory language “must be ‘plain and susceptible of no other reasonable construction’ than that the Legislature intended to be bound to a contract.” In re Certified Question, supra at 778, quoting Stanislaus Co v San Joaquin & King’s River Canal & Irrigation Co, 192 US 201, 208; 24 S Ct 241; 48 L Ed 406 (1904). If the statutory language “ ‘provides for the execution of a written contract on behalf of the state the case for an obligation binding upon the state is clear.’ ” Nat’l R, supra at 466, quoting Dodge, supra at 78 (emphasis supplied in Nat’l R). But, “absent ‘an adequate expression of an actual intent’ of the State to bind itself,” courts should not construe laws declaring a scheme of public regulation as also creating private contracts to which the state is a party. Nat’l R, supra at 466-467, quoting Wisconsin & Michigan R, Co v Powers, 191 US 379, 386-387; 24 S Ct 107; 48 L Ed 229 (1903). In addition to the absence of contractual language, some federal courts, when interpreting statutes involving public-employee pension benefit plans, have expressed even greater reluctance to infer a contractual obligation where a legislature has not explicitly precluded amend *663 ment of a plan. Nat’l Ed Ass’n-Rhode Island v Retirement Bd of the Rhode Island Employees’ Retirement System, 172 F3d 22, 27 (CA 1, 1999). This reluctance stems not only from the caution against finding an implied surrender of legislative power, but also from the realization that legislatures frequently need to utilize that power to modify benefit programs and compensation schedules. Id. Further, this reluctance is grounded in the realization that “it is easy enough for a statute explicitly to authorize a contract or to say explicitly that the benefits are contractual promises, or that any changes will not apply to a specific class of beneficiaries (e.g., those who have retired).” Id. at 27-28 (citations omitted). In the area of worker’s compensation, this Court has also followed this principle and stated that, as a general rule, a statute will not be held to have created contractual rights “if ‘the Legislature did not covenant not to amend the legislation.’ ” In re Certified Question, supra at 778, quoting Franks v White Pine Copper Div, 422 Mich 636, 654; 375 NW2d 715 (1985). Finally, in addition to the absence of such clear and unequivocal statutory language, the circumstances of a statute’s passage may “belie an intent to contract away governmental powers.” Nat’l R, supra at 468.
The plaintiffs in this case have failed to overcome the strong presumption that the Legislature did not intend to surrender its legislative powers by entering into a contractual agreement to provide retirement health care benefits to public school employees when it enacted MCL 38.1391(1). Nowhere in MCL 38.1391(1), or in the rest of the statute, did the Legislature provide for a written contract on behalf of the state of Michigan or even use terms typically associated with contractual relationships,[21] such as “contract,” “covenant,” or *664 “vested rights.”[22] Had the Legislature intended to surrender its legislative powers through the creation of contractual rights, it would have expressly done so by employing such terms. Indeed, by its plain language, the statute merely shows a policy decision by the Legislature that the retirement system pay “the entire monthly premium or membership or subscription fee” for the listed health care benefits on behalf of a retired public school employee who chooses to participate in whatever plan the board and the Department of Management and Budget authorizé. However, nowhere in the statute did the Legislature require the board and the department to authorize a particular plan containing a specific monthly premium, membership, or subscription fee or, alternatively, explicitly preclude the board and the department from amending whatever plan they authorize.[23] Additionally, nowhere in the statute did the Legislature require the board and the department to authorize a plan containing specified deductibles and copays. In fact, nowhere in the statute *665 did the Legislature even mention deductibles and co-pays. Further, nowhere in the statute did the Legislature covenant that it would not amend the statute to remove or diminish the obligation of the MPSERS to pay the monthly premium, membership, or subscription fee; nor did it covenant that any changes to the plan by the board and the department, or amendments to the statute by the Legislature, would apply only to a specific class or group of public school retirees.[24] Again, had the Legislature intended to surrender its power to make such changes, it would have done so explicitly.
Although we need not do so because of the absence of clear and unequivocal language showing an intent to contract, we note that the circumstances surrounding the Legislature’s enactment of MCL 38.1391(1) provide further evidence that the Legislature did not intend to contract away its legislative powers.[25] As was discussed by the Court of Appeals, initially the Legislature required the MPSERS to pay a portion of the premium for health care benefits for public school retirees through the enactment of the predecessor of MCL 38.1391, former MCL 38.325b of the Public School Employees Retirement Act, 1945 PA 136, and subsequent legislatures have exercised their powers to amend the statute many times throughout the years to change the type of plans that the board could authorize, the criteria for the beneficiaries on whose behalf the MPSERS could pay the premiums for various benefits, and the amounts of those premiums that the MPSERS was required to pay.[26] Thus, there is no indication that the Legislature that enacted MCL 38.1391(1) in 1980 intended to do anything beyond what its predecessors had done — set *666 forth a policy to be pursued until one of its successor legislatures ordained a new policy.[27] Additionally, as was also analyzed by the Court of Appeals, the health care plan itself has been amended and modified by the MPSERS numerous times since 1975, not only to increase the benefits available but also to increase the amounts of the copays and deductibles that participants were required to pay.[28] In their appeal to this Court, plaintiffs have not only conceded that these statutory amendments and changes to the plan have occurred, but also expressly conceded during oral argument that the Legislature and the board have the authority to make such changes. Thus, plaintiffs themselves, by the positions they have taken, have effectively recognized that MCL 38.1391(1) merely established a legislative policy that could be changed by a successor legislature rather than providing for a surrender of such legislative power through the creation of a contractual relationship.
We further note that, as part of the 1979 Public School Employees Retirement Act, in which MCL 38.1391(1) is included, the Legislature also enacted MCL 38.1303a(l), which defines “compensation” for *667 public school employees as “the remuneration earned by a member for service performed as a public school employee.” Thus, by enacting this statute, the Legislature recognized that an implied-in-law contractual relationship can arise between the school system and public school employees. Specifically, a public school employee can become contractually entitled to “compensation” by first performing services. However, payment of health care premiums by the MPSERS under MCL 38.1391(1) is not among the list of items that the Legislature specifically set forth as being part of an employee’s “compensation” in MCL 38.1303a(2)(a) through (h). Additionally, and more importantly, MCL 38.1303a(3) expressly lists items that are not included within the definition of compensation and includes, among other things, “[pjayments for hospitalization insurance and life insurance premiums,”[29] and “[o]ther fringe benefits paid by and from the funds of employers of public school employees.”[30] This causes us to conclude that surely the Legislature would not specifically exclude the payment of health care benefits from the list of items that a public school employee could, potentially, become contractually entitled to by having performed services but, at the same time, intend to vest plaintiffs with a contractual right to receive such benefits through the simultaneous enactment of MCL 38.1391(1). Accordingly, it seems evident that the way to understand these enactments is that the Legislature intended for payment of health care benefits by the MPSERS under MCL 38.1391(1) to simply be a “fringe *668 benefit” to which public school employees would never have a contractual entitlement.[31]
Thus, because the plain language of MCL 38.1391(1) does not clearly indicate that the Legislature intended to surrender its legislative powers through the statute’s enactment, we hold that MCL 38.1391(1) does not create for public school employees a contractual right to health care benefits. We therefore reverse the Court of Appeals conclusion to the contrary. However, - because the Court of Appeals ultimately reached the correct result, we affirm its ultimate conclusion to uphold the circuit court’s entry of summary disposition in favor of defendants.[32]
V RESPONSE TO THE DISSENT
We would be remiss if we failed to point out that the ad hoc analysis employed by the dissent to determine that public school retirees possess a contractual right to health care benefits, rendering the Legislature powerless to alter or do away with them, is particularly disturbing and, taken to its logical conclusion, would undermine this state’s constitutionally guaranteed republican system of government.
*669 The most treasured civic possession of an American citizen is the right to self-government. It is the central pillar and animating force of our constitutions. Thus, US Const, art IY § 4 provides that “[t]he United States shall guarantee to every State in this Union a Republican Form of Government....” The Michigan Constitution, Const 1963, art 1, § 1 states similarly that “[a]ll political power is inherent in the people,” and the importance the founding generation gave to this can be seen by its reiteration repeatedly in the documents preceding, coinciding with, and following the adoption of the United States Constitution in 1789. Thus, Congress provided in the Northwest Ordinance that the constitutions and governments of the states to be formed in the territory, of which states Michigan is one, “shall be republican....” Northwest Ordinance of 1787, art V This requirement was carried forward by Congress when it severed Michigan from the Northwest Territory in 1800 and made it part of the Indiana Territory, 2 US Stat, Ch XLI, § 2, and again in 1805 when it likewise severed Michigan from the Indiana Territory and established the Michigan Territory, 2 US Stat, Ch Y § 2, by requiring both times that the government established in those territories was to be “in all respects similar” to that provided in the Northwest Ordinance of 1787.
What this means concretely is that what one legislature has done, pursuant to the majority sentiment at that time, a later legislature responding to the then majority can modify or undo. Deprived of this right, self-government is not just hollow, it is nonexistent.
Yet, as the United States Supreme Court has held and we have discussed in this opinion, when the Legislature enters into a contract, a subsequent legislature cannot repudiate that contract. It seems obvious that to *670 read what is a contract too broadly swallows the right of the people to change the course of their governance. This is the tension that we have attempted to address and thoroughly analyze, whereas the dissent has just blithely assumed that any benefit once conferred is a contract and cannot be altered. This is an ill-considered notion that in cases yet to be seen, but surely to be seen if this were to become the majority position, means that, for example, general assistance welfare benefits could not be altered, Medicaid would be frozen in its first enacted form, and, in short, any financial benefit would be unalterable.
This is not and surely cannot be our law. Yet, the dissent claims that the recipients of the benefits will be surprised it is not. Will they? No one should be surprised that benefit battles are fought out in the Legislature. On the contrary, those who could claim legitimate surprise would be our citizens who, were there two more votes on this Court to join the dissent and make it a majority, would have lost, in the fog of a baffling contract analysis, the right to change the course of their government. Indeed, that would be more than surprising, it would be revolutionary.
VI. CONCLUSION
We hold that health care benefits are not “accrued financial benefits” and, thus, are not protected by Const 1963, art 9, § 24. Accordingly, we affirm the Court of Appeals on this issue. We further hold that the Legislature did not intend to create a contractual relationship with public school employees by enacting MCL 38.1391(1) and, thus, payment of health care benefits by the MPSERS is not a contractual right subject to protection by Const 1963, art 1, § 10 and US Const, art I, § 10. We therefore reverse the Court of *671 Appeals determination on this issue. However, because the Court of Appeals reached the correct result, we affirm its determination that the circuit court properly entered summary disposition in defendants’ favor.
Corrigan, Young, and Markman, JJ., concurred with Taylor C.J.

 260 Mich App 460; 679 NW2d 88 (2004).

2 260 Mich App at 466-467.

 471 Mich 875 (2004).

 Justice Weaver did not participate. 448 Mich at 503.

 Musselman I, supra at 512-513, quoting 1 Official Record, Constitutional Convention 1961, p 772 (delegate Stafseth); Musselman I, supra at 512 n 5, quoting 1 Official Record, Constitutional Convention 1961, p 771' (delegate Van Dusen).

 260 Mich App at 473.

 Id. at 425.

 It seems apparent, but to foreclose confusion that the dissent may engender, that the 2004 view of the Governmental Accounting Standards Board (GASB) that the dissent relies on to define terms is entirely irrelevant to what ratifiers in 1963 would have understood. Furthermore, the passage quoted from the GASB by the dissent does not even purport to define any of these terms but merely directs how to handle the accounting fringe benefits entail.

 Musselman I, supra at 510.

 See, e.g., MCL 38.1384.

 MCL 38.1391(1) provides that “[t]he retirement system shall pay the entire monthly premium or membership or subscription fee for hospital, medical-surgical, and sick care benefits for the benefit of a retirant or retirement allowance beneficiary who elects coverage in the plan authorized by the retirement board and the department.”

 The dissent claims that we are not defining words with any reference to context. This is not the case. Indeed, we are as committed to that interpretive tool as the dissent claims to he, and this opinion bears witness to that. The difference between us, however, is that we are endeavoring to place words in the context of other words while the dissent places words in the context of something far more vague, apparently nothing more than its own sense of the preferred result.

 “Constitutional Convention debates and the Address to the People are certainly relevant as aids in determining the intent of the ratifiers.” (Emphasis added.)

 See, generally, Beech Grove Investment Co v Civil Rights Comm, 380 Mich 405, 425-428; 157 NW2d 213 (1968), in which this Court examined, among other things, the statements of delegates to the constitutional convention and the Address to the People in order to discern the meaning of the term “civil rights” as used in Const 1963, art 5, § 29, but, in doing so, expressly recognized that “it is the Constitution, not the debates, that was finally submitted to the people. While the debates may assist in an interpretation of the Constitution, neither they nor even the Address to the People is controlling.” Beech Grove, supra at 427.

 See, also, Lockwood v Comm’r of Revenue, 357 Mich 517, 536-537; 98 NW2d 753 (1959) (CARR, J., dissenting):
It is incredible that the legislature in submitting to popular vote the proposed amendment [of Const 1908, art 10, § 23] at the general election in 1954, or that the people in voting thereon, intended that the term “sales tax” as used in the clauses of said amendment providing for the apportionment of sales tax funds in the manner stated therein, and in inhibiting the legislature from increasing the sales tax above 3%, intended to use the term in question with different meanings. In other words, it must be assumed that the designation was used in the proviso imposing limitation on the power of the legislature with reference to the increase in the sales tax with exactly the same meaning as clearly intended in the so-called diversion clauses. [Emphasis added.]

 “No bill of attainder, ex post facto law or law impairing the obligation of contract shall be enacted.”

 “No State shall . .. pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts, or grant any Title of Nobility.”

18 “Retirement system” refers to the MPSERS. MCL 38.1307(8).

19 “Department” refers to the Department of Management and Budget. MCL 38.1304(4).

 United States v Winstar Corp, 518 US 839, 873; 116 S Ct 2432; 135 L Ed 2d 964 (1996) (opinion by Souter, J.); Community-Service Broadcasting of Mid-America, Inc v Fed Communications Comm, 192 US App DC 448, 459; 593 F2d 1102 (1978); Mirac, supra at 430; Ballard v Ypsilanti Twp, 457 Mich 564, 569; 577 NW2d 890 (1998).

 Nat’l R, supra at 467.

 It is clear that the Legislature can use such nomenclature when it wishes to. For instance, when enacting 1982 PA 259, which requires the state treasurer to pay the principal of and interest on all state obligations, the Legislature provided in MCL 12.64: “This act shall be deemed a contract with the holders from time to time of obligations of this state.” (Emphasis added.) Similarly, when enacting the State Housing Development Authority Act, 1966 PA 346, the Legislature provided in MCL 125.1434: “The state pledges and agrees with the holders of any notes or bonds issued under this act, that the state will not limit or alter the rights vested in the authority to fulfill the terms of any agreements made with the holders thereof, or in any way impair the rights and remedies of the holders until the notes or bonds, together with the interest thereon, with interest on any unpaid installments of interest, and all costs and expenses in connection with any action or proceeding hy or on behalf of such holders, are fully met and discharged. The authority is authorized to include this pledge and agreement of the state in any agreement with the holders of such notes or bonds.” (Emphasis added.)

 Nat’l Ed Ass’n-Rhode Island, supra at 27.

 Id. at 27-28; In re Certified Question, supra at 778.

 Nat’l R, supra at 468.

 260 Mich App at 463-465.

 Nat’l R, supra at 466.

 The Court of Appeals, 260 Mich App at 465-466, stated:
The MPSERS provides a health care plan for retirees. Cost-sharing features have been a part of the health plan since its inception in 1975. The individual and family deductible component of the health care plan has gradually increased from 1982 to 1999, beginning with a deductible of $50 for each person and $100 for each family in 1982, and gradually rising to a deductible of $145 for each person and $290 for each family in 1999. Cost sharing for the prescription drug program also had gradual increases, ranging from a copay of ten percent in 1975 to a copay of $4 for generic drugs and $8 for brand name drugs in 1997 through March 31, 2000. There is no dispute that the MPSERS health care plan also gradually increased the benefits available under the plan.

 MCL 38.1303a(3)(c) (emphasis added).

 MCL 38.1303a(3)(d).

 This fact not only belies plaintiffs’ claim that MCL 38.1391(1) shows a legislative intent to vest public school retirees with a contractual right to health care benefits, but also renders erroneous the Court of Appeals statement that “[h]ealth insurance is part of an employee’s benefit package and the whole package is an element of consideration that the state contracts to tender in exchange for services rendered by the employee.” 260 Mich App at 476. Indeed, MCL 38.1303a makes clear that payment of health care benefits by the MPSERS is not an element of the consideration that the state contracts to tender as remuneration for a public school employee’s services.

 Having concluded that MCL 38.1391(1) does not create a contract, we need not address plaintiffs’ argument challenging the Court of Appeals determination that the copay and deductible increases do not operate as a substantial impairment of a contractual relationship.