# STATE OF MICHIGAN

# COURT OF APPEALS

AFT MICHIGAN, HENRY FORD
COMMUNITY COLLEGE ADJUNCT
FACULTY ORGANIZATION, AFL CIO, AFT,
ALPENA MONTMORENCY ALCONA ISD
PARAPROFESSIONALS, ALPENA
MONTMORENCY ALCONA ISD TEACHERS,
ARENAC EASTERN FEDERATION, BAY
ARENAC SKILLS CENTER FEDERATION,
BROWN CITY EMPLOYEES ORGANIZATION,
BROWN CITY FEDERATION OF TEACHERS,
CHEBOYGAN OTSEGO PRESQUE ISLE
SUPPORT PERSONNEL, CHEBOYGAN
OTSEGO PRESQUE ISLE INTERMEDIATE
PARAPROFESSIONALS, CHEASANING
UNION AUXILIARY SERVICE EMPLOYEES,
CLARE GLADWIN ISD FEDERATION,
CRAWFORD AUSABLE BUS DRIVERS
FEDERATION, CRAWFORD AUSABLE
CUSTODIANS SECRETARIAL FEDERATION,
CRAWFORD AUSABLE FEDERATION OF
TEACHERS, CRAWFORD AUSABLE
SUPPORT STAFF FEDERATION,
CRESTWOOD FEDERATION OF TEACHERS,
CTR FEDERATION, DEARBORN
FEDERATION OF SCHOOL EMPLOYEES,
DEARBORN FEDERATION OF TEACHERS,
DETROIT ASSOCIATION OF EDUCATIONAL
OFFICE EMPLOYEES, DETROIT
FEDERATION OF PARAPROFESSIONALS,
DETROIT FEDERATION OF TEACHERS,
EAST DETROIT FEDERATION OF
TEACHERS, ECORSE FEDERATION OF
TEACHERS, FAIRVIEW FEDERATION OF
TEACHERS, FEDERATION OF TEACHERS,
GLEN LAKE FEDERATION OF TEACHERS,
HALE FEDERATION OF TEACHERS,
HAMTRAMCK FEDERATION OF TEACHERS,
HEMLOCK FEDERATION OF TEACHERS,
HENRY FORD COMMUNITY COLLEGE

FOR PUBLICATION
June 7, 2016
9:10 a.m.

ADJUNCT FACULTY ORGANIZATION, HENRY FORD COMMUNITY COLLEGE FEDERATION OF TEACHERS, HIGHLAND PARK FEDERATION OF PARAPROFESSIONALS, HIGHLAND PARK FEDERATION OF TEACHERS, HURON VALLEY CONTINUING EDUCATION, IMLAY CITY FEDERATION OF TEACHERS, INKSTER FEDERATION OF TEACHERS, IOSCO ISD FEDERATION OF TEACHERS, IOSCO ISD INTERMEDIATE FEDERATION OF AUXILIARY EMPLOYEES, KINGSLEY FEDERATION OF TEACHERS, KIRTLAND COMMUNITY COLLEGE FEDERATION OF TEACHERS, LAMPHERE FEDERATION OF PARAPROFESSIONALS, LAMPHERE FEDERATION OF TEACHERS, LANSING COMMUNITY COLLEGE ADMINISTRATIVE ASSOCIATION, LES CHENEAUX FEDERATION OF SUPPORT STAFF, LES CHENEAUX FEDERATION OF TEACHERS, LAKE CITY SUPPORT STAFF FEDERATION, LAKE CITY TEACHERS AND PARAPROFESSIONALS FEDERATION, LAKE SHORE FEDERATION OF EDUCATIONAL SECRETARIES, LAKE SHORE FEDERATION OF TEACHERS, LAKE SHORE FEDERATION SUPPORT STAFF, MACOMB INTERMEDIATE FEDERATION OF PARAPROFESSIONALS, MACOMB INTERMEDIATE FEDERATION OF TEACHERS, MELVINDALE NAP FEDERATION OF TEACHERS, MELVINDALE NAP PARAPROFESSIONALS, MIDLAND FEDERATION OF PARAPROFESSIONALS, MIDLAND ISD FEDERATION OF PARAPROFESSIONALS, MIDLAND ISD FEDERATION OF TEACHERS, NORTHVILLE FEDERATION OF PARAPROFESSIONALS, ONWAY FEDERATION OF SCHOOL RELATED PERSONNEL, ONWAY FEDERATION OF TEACHERS, PLYMOUTH CANTON COMMUNITY SCHOOL SECRETARIAL UNIT, PLYMOUTH CANTON FEDERATION OF PLANT ENGINEERS, ROMULUS FEDERATION OF PARAPROFESSIONALS, ROSEVILLE

FEDERATION OF TEACHERS, RUDYARD
FEDERATION OF AIDES, RUDYARD
FEDERATION OF TEACHERS, SAGINAW ISD
FEDERATION OF TEACHERS, TAWAS AREA
FEDERATION OF TEACHERS, TAYLOR
FEDERATION OF TEACHERS, UTICA
FEDERATION OF TEACHERS, VAN DYKE
EDUCATIONAL ASSISTANTS FEDERATION,
VAN DYKE PROFESSIONAL PERSONNEL,
WARREN WOODS FEDERATION OF
PARAPROFESSIONALS, WASHTENAW
INTERMEDIATE SCHOOL EMPLOYEES
FEDERATION, WATERFORD ASSOCIATION
OF SUPPORT PERSONNEL, WAYNE COUNTY
COMMUNITY COLLEGE FEDERATION OF
TEACHERS, WAYNE COUNTY COMMUNITY
COLLEGE PROFESSIONAL AND ADMIN
ASSOCIATION, WAYNE COUNTY RESA
SALARIED STAFF, WEXFORD MISSAUKEE
ISD FEDERATION OF TEACHERS,
WHITEFISH TOWNSHIP FEDERATION OF
TEACHERS, CHEBOYGAN OTSEGO
PRESQUE ISLE ISD TEACHERS and
HEMLOCK AUXILIARY SERVICE
EMPLOYEES,

   Plaintiffs-Appellees,

v

STATE OF MICHIGAN,

   Defendant-Appellant.

No. 303702
Court of Claims
LC No. 10-000091-MM

---

TIMOTHY L. JOHNSON, JANET HESLET,
RICKY A. MACK and DENISE ZIEJA,

   Plaintiffs-Appellees/Cross-
   Appellants,

v

PUBLIC SCHOOL EMPLOYEES RETIREMENT
SYSTEM, PUBLIC SCHOOL EMPLOYEES
RETIREMENT SYSTEM BOARD, TRUST FOR

No. 303704
Court of Claims
LC No. 10-000047-MM

-3-

PUBLIC EMPLOYEE RETIREMENT HEALTH CARE and DEPARTMENT OF TECHNOLOGY, MANAGEMENT, AND BUDGET,

> Defendants-Appellants/Cross-Appellees,

and

DIRECTOR OF DEPARTMENT OF TECHNOLOGY MANAGEMENT AND BUDGET, DIRECTOR OF RETIREMENT SERVICES OFFICE and STATE TREASURER,

> Defendants.

---

DEBORAH MCMILLAN, THOMAS BRENNER, THERESA DUDLEY, KATHERINE DANIELS and COREY CRAMB,

> Plaintiffs-Appellees/Cross-Appellants,

v

PUBLIC SCHOOL EMPLOYEES RETIREMENT SYSTEM, PUBLIC SCHOOL EMPLOYEES RETIREMENT SYSTEM BOARD, TRUST FOR PUBLIC EMPLOYEE RETIREMENT HEALTH CARE and DEPARTMENT OF TECHNOLOGY, MANAGEMENT, AND BUDGET,

> Defendants-Appellants/Cross-Appellees,

and

DIRECTOR OF DEPARTMENT OF TECHNOLOGY MANAGEMENT AND BUDGET, DIRECTOR OF RETIREMENT SERVICES OFFICE and STATE TREASURER,

> Defendants.

No. 303706
Court of Claims
LC No. 10-000045-MM

---

ON REMAND

Before: SHAPIRO, P.J., and SAAD and BECKERING, JJ.

SHAPIRO, P.J.

On May 19, 2010, the Legislature enacted 2010 PA 75, significantly revising the Public School Employees Retirement Act (PERA), MCL 38.1301 *et seq.* In particular, subsection 43e of 2010 PA 75 required all current public school employees to contribute three percent of their salaries to the Michigan Public School Employees' Retirement System (MPSERS).[1] These contributions, which were classified as "employer contributions" to a non-vesting retiree health benefit program, constituted a mandatory deduction from the employees' contracted-for compensation with their respective employers. 2010 PA 75, § 43e. Plaintiffs brought suit, challenging the constitutionality of 2010 PA 75. The trial court held that the statute violated plaintiffs' rights under both the Takings Clauses and the Due Process Clauses of the federal and state Constitutions, but held that it did not violate the constitutional provisions barring the impairment of contracts by the state.

The parties appealed to this Court. In *AFT Mich v Michigan*, 297 Mich App 597, 616, 621, 627; 825 NW2d 595 (2012), vacated by *AFT Mich v Michigan*, 498 Mich 851 (2015) (*AFT Mich I*), we held that that 2010 PA 75 was unconstitutional because it (1) impaired employment contracts between public school employees and employer school districts in violation of the Contract Clauses of the state and federal Constitutions, Const 1963, art 1, § 10, and US Const, art I, § 10; (2) affected a taking without just compensation in violation of the Takings Clauses of the state and federal Constitutions, Const 1963, art 10, § 2, and US Const, Ams V and XIV; and (3) violated the guarantees of substantive due process in the state and federal Constitutions, Const 1963, art 1, § 17, and US Const, Am XIV, § 1. On September 27, 2012, defendants sought leave to appeal to the Michigan Supreme Court, which took no action on the application for nearly two years. During that time, and in response to this Court's decision in *AFT Mich I*, the Legislature enacted 2012 PA 300, which further modified PERA. See *AFT Mich v Michigan*, 497 Mich 197, 205; 866 NW2d 782 (2015) (*AFT Mich II*). The 2012 Act did not repeal MCL 38.1343e, but it added provisions substantially altering that section's scope and effect. First, it permitted employees hired before September 4, 2012 to opt out of the retiree health care system as of the first day of the pay period that begins on or after February 1, 2013. MCL 38.1391a(5). Employees that opted out would, as of that date, no longer be subject to the challenged mandatory three percent reduction, and would not receive any health insurance coverage premium from the retirement system. MCL 38.1391a(1), (5). Second, the 2012 Act significantly reduced benefits to those who elected to remain in the retiree health care system. See MCL 38.1391. Third, it provided for a separate retirement allowance for public school employees hired before September 4, 2012 who elected to pay contributions and remain in the system, but

---

[1] The statute required any public school employee whose salary was less than $18,000 to contribute 1.5 percent for the fiscal year starting July 1, 2010. 2010 PA 75, § 43e. Beginning July 1, 2011, all employees were required to contribute the full three percent. *Id.*

later failed to qualify for retiree health care benefits. MCL 38.1391a(8). In other words, it provided a refund mechanism that allowed employee who paid in, but did not ultimately quality for benefits, to receive a refund on their contributions. Finally, the 2012 Act eliminated retirement health benefits under the retirement system for all new employees hired after September 4, 2012. MCL 38.1394a(1).

This Court upheld 2012 PA 300 against a constitutional challenge, reasoning that the voluntary nature of the contributions and the refund mechanism served to remedy the constitutional defects identified in *AFT Mich I*. *AFT Mich v Michigan*, 303 Mich App 651, 673, 676, 676-679; 846 NW2d 583 (2014). The Supreme Court affirmed. *AFT Mich II*, 497 Mich at 249-250.

Shortly after its affirmance in *AFT Mich II*, the Supreme Court vacated our opinion in *AFT Mich I* and remanded it to this Court:

> for reconsideration in light of the enactment of 2012 PA 300 and this Court's decision in [*AFT Mich II*]. On remand, the Court of Appeals shall consider what issues presented in these cases have been superseded by the enactment of 2012 PA 300 and this Court's decision upholding that Act, and it shall only address any outstanding issues the parties may raise regarding 2010 PA 75 that were not superseded or otherwise rendered moot by that enactment and decision. [*AFT Mich v Michigan*, 498 Mich 851 (2015).]

Per the Supreme Court's direction, we have considered whether the adoption of 2012 PA 300 or the Supreme Court's decision in *AFT II* renders moot any of the challenges to 2010 PA 75 or supersedes any of the constitutional analysis we employed in our earlier review of that Act. We conclude that neither the legislative amendments, nor the Supreme Court's decision, supersedes or renders moot any of the issues raised in *AFT Mich I* as to the mandatory wage reductions made during the period 2010 PA 75, but not 2012 PA 300, was in effect (hereinafter "the mandatory wage reduction period" or "the mandatory period"). We also conclude that neither the passage of 2012 PA 300, nor the Supreme Court's decision in *AFT Mich II*, requires that we alter the analysis we employed in our now-vacated decision in *AFT Mich I* as to the constitutionality of 2010 PA 75 as it existed during the mandatory wage reduction period. The compulsory collection of three percent of employee wages during that period was unconstitutional. Accordingly, we remand this matter to the trial court with direction to return the subject funds, with interest, to the relevant employees.

## I. MOOTNESS

The enactment of 2012 PA 300 and our Supreme Court's decision in *AFT Mich II* upholding that Act do not render moot the issues raised in the present cases.

> This Court generally does not address moot questions or declare legal principles that have no practical effect in a case. An issue is moot if an event has occurred that renders it impossible for the court to grant relief. An issue is also moot when a judgment, if entered, cannot for any reason have a practical legal effect on the

existing controversy. [*In re Pollack Trust*, 309 Mich App 125, 154; 867 NW2d 884 (2015) (quotation marks and citations omitted).]

It is undisputed that during the mandatory period, three percent of public school employees' contracted-for wages were withheld by their employers. Those wages, totaling more than $550 million, are being held in escrow pending a final determination in this case. The parties agree that if 2010 PA 75, as it applied during the mandatory period, is found to be constitutional, then the funds held in escrow will be provided to the state, but that if it is found to be unconstitutional, then the escrowed funds will be returned to the employees who earned them. Because determination of the constitutional questions before us will have a practical legal effect on the disposition of the escrowed funds, the issues raised in these cases are not moot.

We must also determine whether the enactment of 2012 PA 300 and the decision in *AFT II*, requires that we alter the analysis in our now-vacated opinion regarding the constitutionality of 2010 PA 75 as applied during the mandatory period. In our earlier opinion we concluded that mandated confiscation of employee wages as employer contributions to a system in which a right to benefits could never vest[2] violated several constitutional guarantees. With the enactment of 2012 PA 300, however, all future contributions became voluntary, not mandatory. Unlike the sums withheld during the mandatory period, all the monies paid from employee wages into the retirement health system were thereafter paid voluntarily; no employee was or could be legally compelled to financially invest in a system where the intended fruits were not "accrued financial benefits." See *Studier v Mich Pub Sch Employees' Retirement Bd*, 472 Mich 642, 658-659; 698 NW2d 350 (2005). The question before us now is whether the change from mandatory to voluntary contributions set forth in 2012 PA 300 retroactively rendered constitutional the reduction of wages during the mandatory period.

As with any question of statutory interpretation and application, we begin with the language of the statute. *Lash v Traverse City*, 479 Mich 180, 187; 735 NW2d 628 (2007). The language of 2012 PA 300, as the state concedes, contains no retroactivity provision and makes no reference to the funds collected during the mandatory period. "Nothing will be read into a clear statute that is not within the manifest intention of the Legislature as derived from the language of the statute itself." *Thomason v WCAC Contour Fabricators, Inc*, 255 Mich App 121, 124-125; 662 NW2d 51 (2003). Accordingly, we may not read the 2012 amendments as retroactive nor as governing funds collected prior to its application.

---

[2] Our conclusion was driven by the decision of the Supreme Court in *Studier v Mich Pub Sch Employees' Retirement Bd*, 472 Mich 642, 649, 658-659; 698 NW2d 350 (2005), that retirement health care benefits did not constitute "accrued financial benefits" and so were not protected from reduction or elimination by art 9, § 24 of the 1963 Const, which provides that "[t]he accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby." (quoting Const 1963, art 9, § 24). See also MCL 38.2733(6), providing that "This act shall not be construed to define or otherwise assure, deny, diminish, increase, or grant any right or privilege to retirement health care benefits . . . to any person[.]"

The state correctly points out that if the escrowed funds are turned over to the state they would be subject to the refund mechanism of 2012 PA 300 for those who ultimately do not qualify for retirement health care benefits. Specifically, MCL 38.1391a(8) provides that the refunded sum shall be "equal to the contributions made by a member under section 43e;" therefore, it must include the sums collected under section 43e from its inception, not merely after the modifications of 2012 PA 300. Thus, it can be argued that so long as MCL 38.1391a(8) remains unaltered and in effect, those employees who do not opt out of the new system but do not ultimately qualify for benefits will not suffer a constitutional deprivation because they will receive back what they put in, including the sums withheld during the mandatory period. Putting aside the fact that the number of employees who will qualify for the refund is likely relatively few, this provision completely fails to address the fundamental constitutional defect imposed by 2010 PA 75 during the mandatory period. The problem was not that mandatory contributions are in and of themselves unconstitutional. The constitutional problem was, and is, that the mandated employee contributions were to a system *in which the employee contributors have no vested rights.* Because retirement health care benefits are not "accrued financial benefits," the legislature has the authority to reduce or eliminate those benefits—including the refund mechanism of MCL 38.1391a(8)—at any time. While there is no constitutional prohibition against inviting employees to voluntarily participate in an unvested system, the same is not true where participation is mandated by law. The wages withheld during the mandatory period were taken without any legally enforceable guarantee that the contributors would receive the retirement health benefits provided to present retirees. That has not changed. The sums withheld during the mandatory period were taken involuntarily and the state still retains the right to reduce or eliminate retiree health benefits for those who were compelled to surrender their wages.[3]

*AFT Mich II* does not provide a basis to alter our analysis of the constitutionality of the involuntary wage reductions during the mandatory period.[4] Accordingly, we conclude that 2010 PA 75 was unconstitutional as it applied from its effective date through the transition date to the voluntary system created by 2012 PA 300.

## II. CONTRACTS CLAUSE

During the mandatory period, section 43e of 2010 PA 75 operated as a substantial impairment of the employment contracts between the plaintiffs and the employing educational entities. The employment contracts provided for a particular amount of wages and 2010 PA 75 required that the employers not pay the contracted-for wages, but instead pay three percent less

---

[3] Indeed, 2012 PA 300 does not even contain a provision to refund the involuntarily withheld sums to those employees who chose not to participate in the retirement health system after enactment of 2012 PA 300.

[4] In addition, in their supplemental briefs on remand, the parties have not referred us to any recent caselaw that would suggest we should alter our analysis.

than the contracts provided.[5]  We note that this is not a broad economic or social regulation that impinges on certain contractual obligations by happenstance or as a collateral matter.  Rather, the statute directly and purposefully required that certain employers not pay contracted-for wages.  Such an action is unquestionably an impairment of contract by the state.  "In the employment context, there likely is no right both more central to the contract's inducement and on the existence of which the parties more especially rely, than the right to compensation at the contractually specified level."  *Baltimore Teachers Union, American Federation of Teachers Local 340, AFL-CIO v Baltimore Mayor and City Council*, 6 F3d 1012, 1018 (CA 4, 1993).  See, also, *Buffalo Teachers Federation v Tobe*, 464 F3d 362, 368 (CA 2, 2006) ("Contract provisions that set forth the levels at which union employees are to be compensated are the most important elements of a labor contract.  The promise to pay a sum certain constitutes not only the primary inducement for employees to enter into a labor contract, but also the central provision upon which it can be said they reasonably rely.").

In *Baltimore Teachers*, the Fourth Circuit held that a temporary furlough plan under which employees lost just under one percent of their annual salary for one year constituted a substantial impairment of contract.[6]  The present case involves a reduction three times as great and not merely for a single year.  Plaintiffs have agreed to provide their labor and expertise to the school districts for wages bargained for and set forth in contract.  For the state to mandate a three percent reduction in the contractually agreed-upon price of their labor is unquestionably an impairment of contract by the state.

That does not, however, resolve the constitutional question.  In order to determine whether that impairment violates the Contract Clause, we must determine whether the state has shown that it did not: "(1) 'consider impairing the . . . contracts on par with other policy alternatives' or (2) 'impose a drastic impairment when an evident and more moderate course would serve its purpose equally well,' nor (3) act unreasonably 'in light of the surrounding circumstances[.]' "  *Buffalo Teachers*, 464 F3d at 371, quoting *United States Trust Co of New York v New Jersey*, 431 US 1, 30-31; 97 S Ct 1505; 52 L Ed 2d (1977).  Put more generally, we

---

[5] Defendants argue that there is no unconstitutional impairment of contract because (1) plaintiffs do not have a contract that is affected by 2010 PA 75 and because (2) plaintiffs do not have a contractual right to be free from mandatory deductions for retiree healthcare or to continue in a particular retiree healthcare plan.  These arguments are wholly without merit.  Plaintiff employees' employment contracts, which set forth specified wages, were unquestionably impaired by 2010 PA 75's mandatory and involuntary requirement that three percent of their wages be withheld and transformed into employer contributions to a retiree health care system without vested benefits.  Moreover, plaintiffs have never claimed that they have a right to be free of mandatory deductions in general; they have only claimed a right to be free from unconstitutional, mandatory deductions.

[6] The *Baltimore Teachers* Court noted that "because individuals plan their lives based upon their salaries, we would be reluctant to hold that any decrease in an annual salary beyond one that could fairly be termed *de minimis* could be considered insubstantial."  *Baltimore Teachers*, 6 F3d at 1018 n 8.

are to determine whether the particular impairment is "*necessary* to the public good. . . ." *In re Certified Question*, 447 Mich 765, 777; 527 NW2d 468 (1994) (emphasis added).

In addressing these issues, we must consider that the employers in question are themselves governmental entities and that these entities benefited as a result of the challenged legislation given that they used the monies collected as "employer contributions" that they would have otherwise had to pay to the retiree health care benefits fund.[7] Because a governmental entity is party to the contract and benefits from the impairment, we are to employ heightened scrutiny in our review of the statute. *Buffalo Teachers*, 464 F3d at 370-371.

As a general rule, courts have found statutes impairing contractual obligations to be reasonable and necessary when the impairment is the consequence of remedial legislation intended to correct systemic imbalances in the marketplace. Such legislation may have positive or negative effects on particular economic actors and may in some cases result in altered contractual obligations without offending the Contract Clause. For example, we rejected a Contract Clause challenge in *Health Care Ass'n Workers Compensation Fund v Bureau of Worker's Compensation Director*, 265 Mich App 236, 242; 694 NW2d 761 (2005), which involved a statute designed to unclog the marketplace for workers' compensation insurance by eliminating unduly anti-competitive contractual provisions that punished employers for changing insurers. Similarly, the United States Supreme Court held that correcting an imbalance between gas prices on the interstate and intrastate markets was a significant and legitimate state interest. *Energy Reserves Group, Inc v Kansas Power & Light Co*, 459 US 400, 417; 103 S Ct 697; 74 L Ed 2d 569 (1983). The present case, however, does not involve corrections to the marketplace to assure free competition.

We recognize that there are cases holding that a modest, temporary impairment of government contracts may be imposed as a matter of last resort to address a fiscal emergency. However, as the cases relied upon by defendants show, such circumstances must be extraordinary and the degree of the impairment in amount and in time is central to the question whether the impairment passes constitutional muster. "The severity of the impairment measures the height of the hurdle the state legislation must clear." *Allied Structural Steel Co v Spannaus*, 438 US 234, 245; 98 S Ct 2716; 57 L Ed 2d 727 (1978). As in *Allied Structural*, the statute at issue here worked "a severe, permanent and immediate change in [contractual] relationships." *Id.* at 250.

In *Baltimore Teachers*, 6 F3d at 1014, the city of Baltimore responded to sudden budget shortfalls caused by reductions in state aid of over $37 million during the last three months of 1991 by imposing involuntary furloughs for city employees. These furloughs were not conceived of as a long-term funding mechanism, but instead as a temporary response to a fiscal emergency. *Id*. at 1021. The furlough days resulted in Baltimore reducing annual salaries by less than one percent and only for a single year. Moreover, while the furloughs were involuntary, employees were provided with reduced hours that were equivalent to the reduction

---

[7] According to the record, the three percent wage reduction will cover nearly 40 percent of the overall *employer* contributions for retiree health care benefits.

in their wages. The Fourth Circuit held that while the actions constituted an impairment of contract, they did not violate the Contract Clause because the wage reduction was temporary, the amount of the resulting reduction in wages was no greater than necessary to meet the immediate budgetary shortfall, and the city had first taken other actions, including a significant cut in city services and laying off employees. *Id.* at 1020. In contrast, subsection 43e of 2010 PA 75 reduced public school employees' wages by an amount more than three times that which concerned the court in *Baltimore Teachers* and did not provide time off in exchange. Further, the provision was not designed as a temporary measure, and the instant defendants presented no evidence to the trial court that other means of undertaking long-term restructuring of retiree health benefit funding had been attempted or even reviewed before 2010 PA 75 was adopted.[8]

In *Univ of Hawaii Prof Assembly v Cayetano*, 183 F3d 1096 (CA 9, 1999), the federal appeals court concluded that the state's action in delaying paydays by a few days, even without a reduction in the actual amount of pay, constituted a substantial impairment of contract because the timing of payment was part of the collective bargaining agreement. *Id.* at 1102-1104. As in *Baltimore Teachers* and *Buffalo Teachers*, the *Univ of Hawaii* court noted the higher level of scrutiny applicable to legislative interference with governmental, as opposed to private, contracts and struck down the payday delays noting that " 'although perhaps politically more difficult, numerous other alternatives exist which would more effectively and equitably raise revenues' " such as additional budget restrictions, the repeal of tax credits, and the raising of taxes. *Id.* at 1107; see, also *Donohue v Paterson*, 715 F Supp 2d 306 (ND NY 2010).

Further many courts have held that impairments of government employee contracts by the state that have indefinite application clearly violate the Contract Clause. *Opinion of the Justices*, 364 Mass 847, 864; 303 NE2d 320 (Mass, 1973) (striking down legislation increasing present employees' contributions to retiree benefits without an increase in the subject employees' own retirement benefits as "presumptively invalid" under the Contract Clause); *Singer v City of Topeka*, 227 Kan 356, 369; 607 P2d 467 (Kansas,1980) (holding that a statute mandating increase in public employees' contributions to their retirement plan without a commensurate increase in benefits "is an unconstitutional impairment of contract rights"); *Marvel v Dannemann*, 490 F Supp 170 (D Del, 1980); *Hickey v Pittsburgh Pension Bd*, 378 Pa 300; 106 A2d 233 (Penn, 1954); *Allen v City of Long Beach*, 45 Cal 2d 128; 287 P2d 765 (Cal, 1955).

For these reasons, we conclude that 2010 PA 75, from its effective date until the completed transition to a voluntary system, violated US Const art I, § 10 and Const 1963, art I, § 10.

## III. TAKINGS CLAUSE

Under the Takings Clauses of the state and federal Constitutions, Const 1963, art 10, § 2, and US Const, Am V, "[t]he government may not take private property for public use without

---

[8] Indeed, it was only as a result of our decision to strike down 2010 PA 75, that the legislature undertook its responsibility to consider alternative and constitutional funding mechanisms, such as the voluntary system implemented by 2012 PA 300.

providing just compensation to the owner." *AFT Mich II*, 497 Mich at 216. The federal constitutional provision applies to the states through the Fourteenth Amendment, US Const, Am XIV. *Id*. at 217. Here, the plaintiff employees' salaries are specific funds in which they unquestionably had a property interest. See *Sims v United States*, 359 US 108, 110; 79 S Ct 641; 3 L Ed 2d 667 (1959) (stating "it is quite clear, generally, that accrued salaries are property").

There is no doubt that during the relevant time frame, three percent of plaintiff employees' wages were "taken" in the dictionary-definition sense of the word. The state does not dispute that the school districts were taking possession of wages that, by contract, belonged to plaintiffs and sending them to state-mandated funds as *employer* contributions. The question, however, is whether that action constituted a "taking" as it has been defined for purposes of the Fifth Amendment and its Michigan constitutional counterpart. We conclude that it did.

It is well settled that where government directly seizes property in which a person has a property interest, a Fifth Amendment taking occurs requiring the government to pay just compensation. However, taking cases involving a direct seizure of property typically involves real property and the exercise of eminent domain. Taking jurisprudence also commonly deals with claims that governmental regulatory actions impose such limits on the use of property that they amount to a taking.

Defendants argue that the confiscation or seizure of money, as opposed to physical property, cannot constitute a taking. Defendants point out that several courts have held that the general imposition of monetary assessments by the government do not raise Fifth Amendment concerns. See, e.g., *McCarthy v City of Cleveland*, 626 F3d 280 (CA 6, 2010). The law is, however, equally clear that where the government does not merely impose an assessment or require payment of an amount of money without consideration, but instead asserts ownership of a specific and identifiable "parcel" of money, it does implicate the Takings Clause. Indeed, the United States Supreme Court has termed such actions "per se" violations of the Takings Clause. *Brown v Legal Foundation of Washington*, 538 US 216, 235; 123 S Ct 1406; 155 L Ed 2d 376 (2003). In *Brown*, the Court held that where the government asserted a right to control the interest on lawyer trust accounts, even where such amounts were *de minimis*, it constituted an unconstitutional taking. *Id.* We applied this principle in *Butler v Mich State Disbursement Unit*, 275 Mich App 309; 738 NW2d 269 (2007). In *Butler*, Judge SAAD writing for the Court, found an unconstitutional taking of property where the state disbursement unit that collects and disburses child support payments was depositing interest on the amounts awaiting disbursement into the state treasury. *Id*. at 310-312. The amount in question was merely 83 cents and it could certainly be argued that the state could reasonably assess such a sum to pay for the collection service that benefited the children and custodial parent. *See id*. at 311-312. However, because the money was part of definable and distinct parcel of money in which the eventual recipient had a property interest, we held it could not be taken without payment of just compensation. See *id*. at 313-314.[9]

---

[9] In *Brown*, the government was not required to pay compensation because the clients could not have earned any interest if they had deposited the funds on their own. *Brown*, 538 US at 239-

-12-

In *Webb's Fabulous Pharmacies, Inc v Beckwith*, 449 US 155; 101 S Ct 446; 66 L Ed 2d 358 (1980), a Florida county court retained the interest from a fund in its custody intended for payment of Webb's creditors. *Id.* at 156-158. The Supreme Court held that the Florida statute authorizing the retention of the interest "has the practical effect of appropriating for the county the value of the use of the fund for the period in which it is held. . . ." *Id.* at 164. Further, the interest could not be treated as a fee for the use of the court because another statute specifically provided for a court fee based on the size of the fund deposited with the court. *Id.* at 164. "To put it another way: a State, by *ipse dixit*, may not transform private property into public property without compensation. . . ." *Id.*[10]

Defendants rely on to two cases from the Federal Circuit Court of Appeals as support for their position, but neither case provides such support. In *Adams v United States*, 391 F3d 1212 (CA Fed, 2004), the federal government had concluded that certain federal law enforcement personnel were administrative employees and, therefore, were not entitled to overtime pay under the Fair Labor Standards Act (FLSA), 29 USC 201 *et seq*. The employees sued under the FLSA and also asserted that the government's failure to pay those sums constituted a taking. The *Adams* court held that an action to enforce payment of a statutory obligation for payment, unlike a *contract* for payment, does not establish a vested property right, without which a takings claim cannot arise. *Id.* at 1223. In *Adams*, the taking claim put the cart before the horse by arguing that failure to pay overtime constituted a taking before any right to that overtime was determined to exist. *Id.* at 1221-1222. This is not the case here because plaintiff employees' had a contract-based property right in their own wages.

---

240. Similarly, in *Butler* no compensation was ordered because the government's administrative costs were greater than the plaintiff's accrued interest, and plaintiff's net loss was therefore zero. *Butler*, 275 Mich App at 313.

[10] In *Eastern Enterprises v Apfel*, 524 US 498, 503-504; 118 S Ct 2131; 141 L Ed 2d 451 (1998), the plaintiff alleged that the Coal Industry Retiree Health Benefit Act, 26 USC 9701 *et seq*., violated the Takings Clause because it required the plaintiff, to pay premiums into a fund to cover benefits for retirees it had not employed. The Supreme Court found this to be unconstitutional. Four of the Justices concluded that it violated the Takings Clause, while Justice Kennedy, in an opinion concurring in the judgment and dissenting in part, reached his conclusion under the Due Process Clause. However, the concerns raised by Justice Kennedy regarding the applicability of the Takings Clause do not arise in the instant case. In his opinion, Justice Kennedy stated:

> The Coal Act does not appropriate, transfer, or encumber an estate in land . . . a valuable interest in an intangible . . . *or even a bank account or accrued interest*. The law simply imposes an obligation to perform an act, the payment of benefits. The statute is indifferent as to how the regulated entity elects to comply *or the property it uses to do so*." [*Id.* at 540 (emphasis added).]

That is by no means the case here. Subsection 43e of 2010 PA 75 confiscated a specific fund, i.e. plaintiff employees' paychecks, and removed three percent of the property before allowing them to take possession of their property.

*Kitt v United States*, 277 F3d 1330, 1336-1337 (Fed Cir, 2002) is similarly inapposite because it involved only a general obligation to pay money under a disputed provision of the tax code. The government did not assert ownership of any particular property and the court relied on that very point to reject the takings claim, noting that "[i]n some situations money itself may be subject of a taking, for example, the government's seizure of currency or its levy upon a bank account. . . . In the present case, however, the government did not seize or take any property of the Kitts. All it did was to subject them to a particular tax to which they previously had not been subject. That government action did not constitute a taking of the amount of the tax they had to pay." *Id.* at 1337.

Accordingly, for these reasons we hold 2010 PA 75 violated the Takings Clauses of the state and federal Constitutions, Const 1963, art 10, § 2, and US Const, Ams V and XIV.

## IV. SUBSTANTIVE DUE PROCESS

> The Fourteenth Amendment to the United States Constitution and Const 1963, art 1, § 17 guarantee that no state shall deprive any person of "life liberty or property, without due process of law." Textually, only procedural due process is guaranteed by the Fourteenth Amendment; however, under the aegis of substantive due process, individual liberty interests likewise have been protected against certain government actions regardless of the fairness of the procedures used to implement them. The underlying purpose of substantive due process is to secure the individual from the arbitrary exercise of governmental power. [*People v Sierb*, 456 Mich 519, 522-523; 581 NW2d 219 (1998) (some quotation marks omitted; citations omitted).]

In other words, "[t]he essence of a claim of violation of substantive due process is that the government may not deprive a person of liberty or property by an *arbitrary* exercise of power." *Landon Holdings, Inc v Grattan Twp*, 257 Mich App 154, 173; 667 NW2d 93 (2003) (emphasis in original).

Under 2012 PA 300, no employee is required to contribute to a retirement health care system. See MCL 38.1391a(1)-(4). Under the 2010 Act they were. Under both Acts, the employees have no vested right to retirement health care benefits. See *Studier*, 472 Mich at 658-659.[11] Under 2012 PA 300, any contributing employee subject to the three percent deduction in

___

[11] In its supplemental brief, the state appears to suggest that it intends to now direct the use of the funds differently. However, these vague and non-binding assurances in their brief are not binding on the state, do not have the force of law, and are wholly irrelevant to the constitutional question before us. The state does not refer us to any case holding that an unconstitutional statute should not be struck down because the state's brief offers a non-binding, non-specific assurance that it will try to minimize the unconstitutional effects of the statute. The issue before us is whether 2010 PA 75 was constitutional prior to the effective date of 2012 PA 30. If, as we conclude, it was not, then the collection of the subject funds was unlawful and they must be returned.

MCL 38.1343e is legally guaranteed compensation if he or she later does not qualify for the benefit, but that was not true under 2010 PA 75. See MCL 38.1391a(8). Despite the state's attempt to conflate the two Acts, it is clear that one is consistent with substantive due process and the other is not.

Defendants argue that the present case is analogous to *Mich Mfr Ass'n v Workers' Disability Compensation Bureau Director*, 134 Mich App 723; 352 NW2d 712 (1984), where this Court upheld a statute requiring all employers in the state to contribute to a fund to help defray the costs of workers' disability compensation for the logging industry. However, that case considered only whether the statute was enacted for a proper purpose and did not address whether it met the second prong of the constitutional test. *Id*. at 733-735. Moreover, the statute related to the broad policy objectives of the workers' compensation system that affect every worker and employer in the state. Workers' compensation legislation was adopted 100 years ago to create a system to share risks and to provide for the limited, but prompt, compensation of injured workers. In addition to obtaining general insurance or insuring themselves, all employers in the state may be required to contribute to specialized funds such as the Second Injury Fund, the Silicosis, Dust Disease, and Logging Industry Compensation Fund, and the Self-Insurers' Security Fund. MCL 418.551. These assessments are part of a state-wide economic regulatory system and contributions to the funding of that system are required of all employers in the state. The statute in *Mich Mfr* represented a small modification in an overall system of sharing risks intended to assure stability in the industrial market-place.

The instant case is wholly different. Payment of health care benefits owed by the government to a particular set of its retired employees is not analogous to the maintenance of a statewide risk-sharing system to assure market and economic stability for the private sector. Rather, it is a question of various levels of government meeting their own fiscal obligations. Defendants posit no evidence or even argument to suggest that the funding of these retirement benefits could not have been satisfied by measures that do not raise due process concerns.[12] The mechanism defined in subsection 43e of 2010 PA 75 was *neither* one involving general taxation for a general fund with specific uses of the monies later determined by the Legislature *nor* one imposing a fee for service to the payee. It was also not a mechanism that required individuals to fund benefits that they themselves had a vested right to receive. For these reasons, we conclude that 2010 PA 75 was unreasonable, arbitrary, and capricious and violated the Due Process Clause.

## V. CONCLUSION

We conclude that 2010 PA 75, as it existed from its effective date until the effective date of 2012 PA 300, was unconstitutional because it violated (1) the Contracts Clauses of the state and federal Constitutions, Const 1963, art 1, § 10, and US Const, art I, § 10; (2) the Takings Clauses of the state and federal Constitutions, Const 1963, art 10, § 2, and US Const, Ams V and XIV; and (3) the guarantees of substantive due process in the state and federal Constitutions,

---

[12] It is clear that such measures, however, exist. See 2012 PA 300 (curing the constitutional deficiencies in 2010 PA 75).

Const 1963, art 1, § 17, and US Const, Am XIV, § 1.  Accordingly, we affirm the trial court's orders granting summary disposition or partial summary disposition in favor of plaintiffs in each of the cases before us and remand the case to the trial court, which shall direct the return of the subject funds, with interest, to the relevant employees.  We do not retain jurisdiction.


/s/ Douglas B. Shapiro
/s/ Jane M. Beckering